FARM AND HOME SAVINGS AND LOAN ASSOCIATION, APPELLANT, v. C. G. STUBBS ET AL., RESPONDENTS.—98 S. W. (2d) 320.

Kansas City Court of Appeals. October 5, 1936.

88

*Ewing, Ewing & Ewing, Randall R. Kitt* and *Paul D. Kitt* for appellant.

*Chapman & Chapman, Taylor & Taylor* and *G. W. Stubbs* for respondent.

REYNOLDS, J.—The plaintiff is a corporation, duly organized, authorized, and existing under the laws of the State of Missouri as a building and loan association, with its home offices at Nevada, Missouri.

It appears that, on or before June 19, 1931, it was the owner of a certain promissory note in the principle sum of $5000, dated October 20, 1925, due ten years after date, executed to it by defendants C. G. Stubbs, Grace Stubbs, E. P. Stubbs, and Cora Stubbs, and that it was secured by a deed of trust of even date with the note executed by said defendants, which conveyed to Lee B. Ewing as trustee certain real estate situated in the city of Chillicothe, Livingston county, Missouri, described as follows: "Beginning 20 feet east of the northwest corner of Block 40, original survey of the town now city of

Chillicothe, Missouri; thence east 20 feet; thence south 60 feet; thence west 20 feet; thence north 60 feet to the point of beginning, being a part of Lot No. 2, Block 40, original survey of said city of Chillicothe;'' that said deed of trust was filed of record in the recorder's office in Livingston county on October 22, 1925, and is found recorded in book 216 at page 566 in the deed records of Livingston county, Missouri; that, on June 19, 1931, there was a balance due plaintiff on said note in the sum of $2722.05; and that, on June 25, 1931, the said note for $5000 was presented for cancellation to the recorder of Livingston county, together with a release deed from plaintiff and said note was cancelled by the recorder and notation made by him on the margin of the record of the deed of trust recorded in book 216 at page 566, releasing said deed of trust, and plaintiff's release deed was filed in said office and duly recorded.

This is a suit in equity by plaintiff to set aside and cancel the marginal release of the deed of trust and the cancellation of the note and to restore the lien of said deed of trust and adjudge it to be a superior lien to a certain deed of trust dated June 19, 1931, executed by defendants C. G. Stubbs and wife, Grace Stubbs, and E. P. Stubbs and wife, Clara Stubbs, to defendant John A. Ryan, trustee for defendant M. E. Ryan, which appears filed for record June 25, 1931, and recorded in book 240 at page 24 of the deed records of Livingston county and which appears to convey the same premises described in the deed of trust, the release of which is sought to be set aside.

It appears that plaintiff maintained an agency at Chillicothe, Missouri, on June 19, 1931, and for some years prior thereto, and that Mrs. Gladys R. McCall, the wife of one F. M. McCall, was its agent at such time; that she was assisted by her husband, F. M. McCall, in her duties as agent and in looking after plaintiff's business at Chillicothe, and by one Miss Lorna Coult (now Mrs. Foster but hereinafter, for convenience, referred to as Miss Coult) whom she employed; that the business of this agency was conducted in an office in the city of Chillicothe known as the office of plaintiff, over the door of which appeared the sign, ''Farm & Home Savings & Loan Association,'' and was in charge of Mrs. McCall, her husband, and Miss Lorna Coult.

There is evidence in the record showing the following facts: Prior to June 19, 1931, G. C. Carnahan, who was representing E. P. Stubbs and C. G. Stubbs and their wives, defendants herein, advised F. M. McCall, one of the agents of plaintiff at Chillicothe, that E. P. Stubbs and C. G. Stubbs desired to take up the note held by plaintiff and secured by a deed of trust on land described in plaintiff's petition and requested Mr. McCall to ascertain for him the amount necessary to discharge the note and further requested him to get the papers of

record necessary to be had to procure the release of the deed of-trust securing the same. On June 19, 1931, some time before noon, Mr. McCall called the home office of plaintiff at Nevada and advised Mr. Carter, the secretary of plaintiff, that the said Stubbs wished to take up their note and asked for information as to the amount necessary for its payment. Some time before noon on June 19, 1931 (the same being Friday), Mr. McCall was advised by telegram from the home office of plaintiff of the amount necessary to retire the Stubbs' note; and this information was given to Mr. Carnahan before noon of the same day. On the afternoon of June 19, 1931, about 1:45 P. M., Mr. Carnahan went to the office, known as the office of plaintiff, which was in charge of F. M. McCall, Gladys R. McCall, and Lorna Coult, and there delivered to Miss Coult, who was then in charge of said office, two checks (one for $606.20, payable to plaintiff, signed by E. P. Stubbs; and the other for $2118.85, payable to plaintiff, signed by Ryan & Carnahan), both drawn on the First National Bank of Chillicothe, Missouri, totaling the amount due on the note together with the charges attending its cancellation of record. Miss Coult had the telegram to Mr. McCall giving the amount necessary for the payment of the note and, upon the receipt of the checks, gave Mr. Carnahan a receipt which read as follows:

"$2722.02                                   6-19      1931

"Received of E. P. & C. G. Stubbs

"Two Thousand Seven Hundred & Twenty Two and no/100——Dollars

"Full paym't in                            Farm & Home
"Paying off loan.                          By L. Coult"

The evidence in the record further tends to show the following: The next day (Saturday) the checks were endorsed by Miss Coult with the rubber stamps used by the agency and, about 11:30 A. M. were deposited by her in the Citizens National Bank of Chillicothe in an account which was carried in the name of Farm & Home Savings & Loan Association, by G. Watts—Agent. The endorsement on each of the checks was as follows: "Pay to order of Citizens National Bank, Chillicothe, Missouri, Farm & Home Savings & Loan Ass'n, F. M. & G. R. McCall, Dis. Agents." Miss Coult usually attended to the actual endorsement of checks and to the making of deposits in the bank. On some days, she made two deposits and on other days one only. These checks, given and delivered as above stated, were not presented to the First National Bank of Chillicothe, Missouri, on June 19 or 20, 1931; and, had they been presented by plaintiff or its agents on either of said dates, they would have been paid by it. The makers of both checks had sufficient money on deposit in said drawee bank or credit with it that, had said checks been presented, they would have been paid. Such drawee bank paid all checks presented to it

on June 19 and 20, 1931. On Monday, June 22, 1931, such bank did not open for business, but remained closed on account of insolvency; and said checks were never actually presented to it for payment.

The evidence further tends to show that, when F. M. McCall called plaintiff's office in Nevada, his wife, Mrs. Gladys R. McCall, was in Nevada and Mr. Carter, plaintiff's secretary at that time, delivered to her the Stubbs' note and mortgage to be paid, together with a deed of release, to be brought by her to Chillicothe and delivered to defendants Stubbs or their agent, Mr. Carnahan; that Mrs. McCall did bring the note and release to Chillicothe and, on Saturday afternoon, June 20, 1931, they were delivered to Mr. Carnahan; that the First National Bank and its assets were taken over on June 22, 1931, by the Comptroller of the Currency of the United States for the purposes of liquidation and have since been in his hands in the process of liquidation; that common creditors and depositors have been paid dividends of 16% on the amount of their deposits and common creditors would not be paid in full and would suffer a loss on their deposits in said bank; that, from 1922 to 1930, the plaintiff's district agents at Chillicothe, who preceded Mrs. McCall as district agents, were J. M. Phelps and W. Y. Griffiths and later her husband assumed and performed the duties of agent along with her; that all of these persons were known as district agents and sold the stock of plaintiff, took applications for loans, collected monthly payments on stocks and monthly payments of interest and principal on loans, received payment of loans that were paid off, handled the making of loans after their approval, collected rents, and looked after the renting of houses and property in Chillicothe owned by plaintiff; that they had certain subagents who sold stock, over whom they had supervision; and that there were over 325 persons making monthly payments on loans and on stock purchased of plaintiff through the Chillicothe district agency and also about 30 persons paying rent to plaintiff's agents in Chillicothe in June, 1931.

The evidence tends to show that, when J. M. Phelps was district agent of plaintiff at Chillicothe, he had assisting him in his work several persons, including Miss Nylene Morris and Miss Edith Holmes, and that each of them received many checks in payment of monthly dues on stock and loans, payable to plaintiff, and that they or any of them or others in the office would endorse these checks in the name of plaintiff and deposit them in some bank in Chillicothe to the credit of plaintiff; that, while Mr. Phelps was agent, he had a large sign on his window, "Farm & Home Savings & Loan Association of Missouri, Nevada, Missouri;" that, when Miss Holmes received checks payable to plaintiff, she would endorse passbooks in her own name; that, during the time W. Y. Griffiths was district agent, Miss Leona Darr and Miss Edith Holmes were in his employ

and assisted him in the agency work for plaintiff and received many checks payable to plaintiff in payment of monthly dues and interest and receipted the passbooks therefor in their own names as receivers thereof and endorsed such checks with a rubber stamp and deposited them in the bank; that Gladys Watts (later Mrs. F. M. McCall) became the district agent for plaintiff at Chillicothe in July, 1930, and had as her assistant in the office Miss Lorna Coult; that, in November, 1930, or about that time, Gladys Watts married F. M. McCall who assumed thereupon and thereafter to act as agent of plaintiff along with her; that Mr. McCall, Mrs. McCall, and Miss Coult, on many occasions prior to and up to and including June 19, 1931, received checks payable to the order of plaintiff and endorsed its name thereon and deposited the same in the Citizens National Bank; that the passbooks showed that Miss Coult on many occasions endorsed such books in her name and received checks payable to the order of plaintiff; that such passbooks were later audited by plaintiff; that these agents (including the McCalls and Miss Coult) received checks in payment of balances due on loans, and these checks were handled in the same manner as above stated; that, when district agents F. M. and Gladys R. McCall desired to remit to plaintiff, they drew a check on the Citizens National Bank against the account therein and signed the same, "Farm & Home Savings & Loan Ass'n, F. M. & G. R. McCall, Dis. Agts.;" that, during the time Mr. Phelps and Mr. Griffiths and the McCalls were district agents at Chillicothe, many of the officers of plaintiff (including members of the Board of Directors, the assistant secretary, and the auditors) visited the office of the agency and could see in what way and by whom the business of plaintiff was being handled; that, while said officers were in said office at Chillicothe, the persons assisting in the office received and endorsed checks in the usual course; that, in instances, rubber stamps were used and in other instances the endorsements were made in the handwriting of the agents; that the office was carried in the telephone book in the name of plaintiff and, when persons called the number of the office, persons in the office answering the phone would say, "Farm & Home office;" that advertisements were carried in the newspapers showing plaintiff had an office in Chillicothe for the general transaction of business; that all of the district agents had substantially the same duties, which, at times, took them away from the office; and that, at such times, they left some assistant in charge of the office to attend to the business.

The evidence tends to show the receipt of checks payable to plaintiff, by district agents and their assistants, over a period of years, to have been continuous and unbroken and their conduct in doing so to have been publicly and commonly practiced and known and to show that defendants E. P. and C. G. Stubbs and G. C. Carnahan were

aware of this course of conduct and knew of such receipt of checks payable to plaintiff.

There was no testimony by any of the officers of plaintiff except a Mr. Carter who had been its assistant secretary, and he testified only that he did not know that agents at Chillicothe were endorsing checks.

Other evidence in the record will be noted in the course of the opinion, if and as occasion may require.

This action was instituted in the Circuit Court of Livingston County and transferred by change of venue to the Circuit Court of Linn County at Linneus, where it was tried and submitted at the December term, 1933, resulting in a final judgment at the June term, 1934, in favor of defendants. From such judgment, plaintiff, after unsuccessful motions for a new trial and in arrest of judgment, appeals.

The petition alleges the ownership by plaintiff of the note in question and alleges that the payment of the same was secured by deed of trust executed by the same defendants upon even date with the note conveying to Lee B. Ewing, trustee, certain real estate owned by defendants Stubbs and fully described in the deed of trust and in the petition; that, on June 19, 1931, there was a balance due on said note in the sum of $2722.05; that, on said date, defendants Stubbs tendered to plaintiff through its agents in Chillicothe two certain checks drawn on the First National Bank of Chillicothe, Missouri, (one for the sum of $606.20, drawn by defendant E. P. Stubbs; and the other for the sum of $2118.85, drawn by Ryan & Carnahan, agents for defendant Stubbs) in payment of the balance due on said note and for the release of the deed of trust of record when said checks should be paid in full to plaintiff by the bank against which they were drawn; that both of said checks were made payable to plaintiff or its order; that, at the time of the delivery of the checks, defendants Stubbs obtained possession of the note and of a certain release deed which had been executed by plaintiff to be delivered on the payment of the checks, releasing the real estate described therein from the lien of the deed of trust.

The petition proceeds on the theory that the checks were not in payment of the note until the cash was actually received thereon by plaintiff and that the delivery of such checks to its agents in Chillicothe for it amounted only to a conditional payment of said note. It alleges that said checks were dishonored by the bank on which they were drawn because of the failure of the bank to open for business on June 22, 1931, and because of the passing of its affairs on that date into the hands of the officers of the United States Government for liquidation; that plaintiff, subsequent to the dishonoring of said checks, demanded of defendants Stubbs the payment of both of the same and also demanded of Ryan & Carnahan payment of the

check issued by them but that none of said parties complied with the demands made and said checks remained unpaid; that, subsequent to the dishonoring of the checks and the demands upon and the refusals of the said defendants to pay the same, such defendants presented said note for $5,000 to the recorder of deeds of Livingston County and filed the deed of release which had been executed by plaintiff and procured the cancellation of said note and the notation on the margin of the record of the deed of trust releasing the deed of trust; that, on June 19, 1931, the defendants C. G. Stubbs and his wife, Grace, and E. P. Stubbs and his wife, Cora, executed to John A. Ryan, trustee for M. E. Ryan, a deed of trust conveying the real estate in question to him in trust, which deed of trust was placed of record on said date; that, at the time of the execution of said deed of trust, both the defendants John A. Ryan and M. E. Ryan knew that said deed of trust was second and inferior to plaintiff's deed of trust and knew that plaintiff's deed of trust was to be released only upon the payment to it by the bank of the checks which had been delivered to it by the defendants Stubbs.

Defendants C. G. Stubbs, Grace Stubbs, E. P. Stubbs, and Cora Stubbs made joint and separate answers and defendant M. E. Ryan made separate answer to the petition. The separate answer of defendant M. E. Ryan was substantially the same as that of defendants Stubbs.

The answer of the defendants Stubbs admits the ownership by plaintiff of the note described in the petition; admits that the same was secured by a deed of trust on the real estate described and that, on June 19, 1931, there was a balance due on said note in the sum of $2722.05 and that, on said date, acting through their agent, G. C. Carnahan, they delivered to the agent of plaintiff in charge of its office in Chillicothe, Missouri, the two checks described in the petition (one for $606.20, drawn by defendant E. P. Stubbs; and the other for $2118.85, drawn by Ryan & Carnahan); admits that, on June 22, 1931, the First National Bank of Chillicothe, on which said checks were drawn, failed to open for business and that its affairs were, on that date, taken over by the Comptroller of the Currency of the United States for the purposes of liquidation; admits that said note for $5000 described in plaintiff's petition was cancelled of record June 25, 1931, and that the deed of release executed by plaintiff was filed of record on that date and notation was made in the margin of the record of the deed of trust securing said note showing its release; admits the execution by them of a deed of trust to John A. Ryan, trustee for M. E. Ryan, covering the premises in the deed of trust released on June 25, 1931, and that said deed of trust was filed of record and recorded in Book 240, page 24; and denies generally all other allegations of the petition.

For further defense, the answer in substance sets up that the two checks described in the petition were dated on June 19, 1931, and delivered during business hours at about two P. M. by the authorized agent of defendants Stubbs, G. C. Carnahan, to the authorized agent of plaintiff in Chillicothe, at its general offices in said city, for the purpose of paying the balance due on the note of defendants Stubbs, described in the petition, and for the purpose of procuring the release of the deed of trust securing the same; that said checks were made payable to plaintiff; that the First National Bank of Chillicothe, Missouri, against which they were drawn, was at that time and had been for years located in the city of Chillicothe and was engaged in the transaction of a general banking business; that said checks were payable on presentation; that, on said date, the drawers of the said checks had on deposit in said bank sufficient funds to their credit for payment of said checks; that said funds are still on deposit in said bank in its assets which were taken over by the Comptroller of the Currency for the United States as receiver; that, on June 19, 1931, at the time that said checks were delivered to plaintiff, said bank was open for and transacting business, had sufficient money on hand with which to pay said checks had they been presented, and had sufficient funds on hand for the payment of said checks had they been presented on either June 19 or 20, 1931; that said checks would have been paid by the drawee bank had they been presented for payment either on June 19 or 20; that they were not presented on either of said dates; that, on June 19, at the time of the delivery of the checks, plaintiff had and maintained an office and place of business in Chillicothe, Missouri, for the transaction of its business in that city and, on said date, at its said offices, said checks were delivered to it and its authorized agents in full payment and discharge of the note and deed of trust of defendants Stubbs held by it; that said checks were so accepted by them; that, in consideration thereof, their said note was thereupon delivered to them together with the deed of trust securing the same and a certain deed of release executed by plaintiff to defendants Stubbs in release of their deed of trust; that, by reason of the premises, said note was fully paid and defendants Stubbs in due course caused the same to be cancelled of record and the lien of the deed of trust securing the same to be released of record; that the delivery of said checks for the purposes aforesaid of paying the balance due on said note and of procuring the release of said deed of trust was made to the agents of plaintiff in Chillicothe, in pursuance of a previous understanding between defendants Stubbs on the one part and plaintiff and its agents on the other part; that, in order to pay such balance due, the defendants Stubbs borrowed through Ryan & Carnahan the sum of $2118.85, for which they executed their note to M. E. Ryan on June 19, 1931, the payment of which they

secured on said date by deed of trust on the real estate described in plaintiff's petition; and that said deed of trust, so executed, was, on June 25, 1931, filed for record and recorded in the recorder's office of Livingston County.

The answer further sets up that it was the duty of plaintiff and its agents to use due diligence in the presentment of said checks for collection to the First National Bank of Chillicothe within a reasonable time after said checks had been delivered to them but that they failed to use such diligence and failed to present said checks on either June 19 or 20, 1931, the reasonable time therefor, on either of which dates they would have been paid; that, on June 22, 1931, said bank failed to open its doors for business and its property and affairs were taken in charge for liquidation by the Comptroller of the Currency; that said bank is now insolvent and was on June 22, 1931; that it was insolvent, if so, on the date that the checks were drawn and delivered to plaintiff, was unknown to the drawers of said checks; that, at the time that said checks were drawn and delivered, the drawee bank had sufficient funds to have paid the same in the ordinary course of business and would have paid the same in full had they been presented on June 19, 1931, or June 20, 1931; that, since said bank went into liquidation, there has been paid 16% to depositors and creditors by the receiver thereof and defendants have no information or knowledge as to when, if ever, any further payments will be made; that, by reason of the carelessness and negligence of plaintiff and its agents in failing to use due diligence to present said checks to the drawee bank for payment within a reasonable time after the same were delivered to them, the defendants and the makers and drawers of said checks have been damaged and will suffer great loss if the prayer of plaintiff's petition be granted.

The answer further sets up, by appropriate averments, an estoppel against plaintiff to deny that its agents and the persons in charge of its office at Chillicothe had authority to receive the said checks of defendants E. P. Stubbs and Ryan & Carnahan in payment of the balance due on the note held by it against defendants Stubbs and to endorse plaintiff's name thereon and collect the same by reason of the course of conduct of such agents and persons in charge of its business and of the transaction thereof, in receiving checks, drafts, and other negotiable instruments payable to plaintiff in payment of purchases of stock and in payment of debts due plaintiff (including those secured by deed of trust) and in endorsing and cashing such checks, drafts, and other negotiable instruments and in surrendering notes and obligations held by plaintiff on such payments to those making such payments, together with release deeds, with the knowledge and acquiescence of plaintiff, which course of conduct and the acquiescence of plaintiff therein had become well known in the com-

munity and to the defendants, who, in reliance upon the apparent authority of said agents and persons in authority in plaintiff's office on account of such course of conduct and plaintiff's acquiescence therein, delivered the checks in question to plaintiff's agents and received the note, deed· of trust, and deed of release therefrom.

Plaintiff made reply to the answer of the defendants Stubbs, in which it denies that it had an office or employees in the city of Chillicothe; avers that it was represented in Chillicothe only by its agents Gladys McCall and F. M. McCall; denies that such agents had any authority to endorse checks or negotiable instruments received by them payable to plaintiff and that it had any knowledge that its agents in Chillicothe were endorsing or had ever endorsed checks or negotiable instruments made payable to plaintiff; and denies generally all other allegations in such answer.

Plaintiff's reply to the answer of defendant M. E. Ryan was the same as its reply to the answer of defendants Stubbs.

## OPINION.

1. Plaintiff complains on this appeal that the trial court erred in not holding as a matter of law that plaintiff was entitled to the relief sought in its petition; that it erred in failing to hold that, under the evidence, there was no authority shown in Mrs. Gladys R. McCall, F. M. McCall, or Miss Coult to endorse the plaintiff's name on the checks received by them from defendants Stubbs payable to plaintiff; that it erred in failing to hold that Miss Coult, Mrs. McCall, and Mr. McCall were without any authority to deliver the release deed described in evidence without the cash necessary to effect such release being first paid them for plaintiff; that it erred.in not holding that the filing of the release deed for record by defendants after the dishonoring of the checks and after such dishonoring was known by them was a fraud on the rights of plaintiff; and that it erred in failing to hold that there was no negligence by plaintiff under the evidence in failing to present the checks for payment to the bank on which they were drawn.

It also complains of error in the admission of certain evidence upon trial which it is unnecessary more fully to note at this point.

It also complains that the delivery of the checks in question to plaintiff or its agents at Chillicothe did not constitute payment by the defendants Stubbs of the debt to it.

2. The underlying questions upon this appeal relate (1) to the authority of the McCalls and their employee with respect to the acceptance of the checks in question in payment of the indebtedness to plaintiff and to the endorsing of the name of plaintiff upon such checks by them as plaintiff's agents and (2) to whether, if they had·

such authority, due diligence was used in the presentment of said checks for payment to the First National Bank of Chillicothe, on which bank they were drawn.

3. First, with respect to the question of agency—

From the mere reading of the petition, it is apparent that there is no issue tendered thereby as to any lack of authority in the McCalls or in Miss Coult as agents for plaintiff to receive the checks in question in conditional payment of the balance due on the note of the defendants Stubbs or as to whether, in fact, they did so receive and accept them. That they were plaintiff's agents and did so accept said checks for plaintiff and had authority so to do necessarily appears admitted by plaintiff from the allegations of its petition.

The cause of action stated by plaintiff in the petition is based, in part, on the delivery of the checks in question to the McCalls and their employee, Miss Coult, as plaintiff's agents, and the acceptance by them for plaintiff of the same in payment of the indebtedness of defendants Stubbs, conditioned upon the payment of the same to plaintiff by the bank on which they were drawn when presented by plaintiff in due course, and based on the further fact that said checks were never paid to plaintiff by the bank but were dishonored and that, subsequent to the dishonor of the same, payment thereof by the drawers thereof upon demand for payment by plaintiff was refused. The petition proceeds on the theory that plaintiff is the rightful owner of the checks.

The petition makes no allegations repudiating the acts of the McCalls and Miss Coult in connection with the delivery of such checks to them and the acceptance of the same by them as being beyond their authority or attempting to avoid such acts on account of lack of authority. It places plaintiff's right to the relief sought on the ground that said checks have not been paid but have been dishonored. By the allegations of its petition, plaintiff ratifies and adopts such acts as within the authority of the parties mentioned as its agents and thereby admits their agency and authority to receive for it the checks in question in conditional payment of the indebtedness due it. That a party is bound by the position taken in its pleadings is well settled.

Plaintiff contends that, notwithstanding that the checks may have been delivered to the McCalls or Miss Coult as its agents, they had no authority to accept anything other than cash. Such contention is not now open to plaintiff in view of its admission in its petition herein of their authority to accept the checks in question and of its ratification therein of their acts as its agents in accepting said checks in conditional payment. [Steinmetz v. Schultz (S. D.), 241 N. W. 734.]

5. Another insistence made by plaintiff is that, notwithstanding the authority of the McCalls and Miss Coult as its agents to receive

the checks in question in conditional payment of the indebtedness of defendants Stubbs to it, they had no authority to endorse the name of plaintiff on said checks for the purpose of presenting the same for payment or otherwise; that the delivery of the checks to them did not constitute payment of the debt until the checks themselves should be paid; and that there was no express agreement that the checks should be taken in payment of the indebtedness and no authority in the McCalls or their employee and subagent, Miss Coult, to make such an agreement.

It may be conceded that the mere acceptance by the McCalls or Miss Coult of the checks in question was not a payment of the indebtedness to plaintiff unless accepted by them upon an express agreement to the effect that they were accepted in payment of such indebtedness and that, in the absence of such agreement, there was no payment of such indebtedness until such checks were paid and the money received thereon by plaintiff. [Maxwell v. Dunham (Mo. App.), 297 S. W. 94; Johnson-Brinkham Co. v. Central Bank of Kansas City, 116 Mo. 558, 22 S. W. 813.]

6. Whether the McCalls or Miss Coult had the authority to make such agreement or whether they did make such an agreement is not necessarily to be determined in order to make the proper disposition of this case. From the allegations of the petition, it must be taken that they did receive such checks at least in conditional payment of the indebtedness; and the petition for the relief sought by plaintiff proceeds on the theory that so to do was within their authority as agents of plaintiff.

If it was within their authority to receive such checks in conditional payment, the further contention as to whether they had the right to endorse plaintiff's name thereon and present them for payment depends on the character and scope of their agency and the course of business between plaintiff and them as its agents.

Upon the record, it is not open to question that the McCalls and Miss Coult were general agents of plaintiff at Chillicothe, for the transaction of certain lines of its business.

7. It clearly appears from the record that plaintiff maintained an agency at Chillicothe for many years for the transaction of certain of its business and that, in the year 1930, it appointed Mrs. F. M. McCall (then Miss Gladys Watts) as its agent and placed her in charge of such agency; that she subsequently married F. M. McCall and, since her marriage to Mr. McCall, Mr. McCall has assisted her in the transaction of the business of such agency and assumed, with the full knowledge of plaintiff, to act as agent for plaintiff along with Mrs. McCall; that plaintiff, in its pleadings herein, recognizes him as one of its agents acting with Mrs. McCall; and that, in August, 1930, Mrs. McCall employed Miss Coult to assist in the office work

of the agency at Chillicothe and in the transaction of plaintiff's business coming into such agency. It clearly appears from the record that the agency of the McCalls was of a general nature and extended to the transaction of all of plaintiff's building and loan business in Chillicothe and in Livingston County and the surrounding counties involving the making of sales of stock in the plaintiff company to persons in that territory; the soliciting and taking of applications for loans from persons in that territory; the collection of monthly dues upon stock held in the plaintiff company by various persons in that territory; the collection of interest on loans held by plaintiff and made to various persons in that territory; the receipt of payment of the principal of loans held in that territory; the handling and making of loans for plaintiff, except as to approval; the securing of tenants for property foreclosed and owned by plaintiff in Chillicothe; the collection of rents from tenants of such property; and the appointment of subagents in Chillicothe and the surrounding territory. It appears that the agency was of some importance and that plaintiff had accounts of numerous customers who held its stock or who had secured loans from it or who were occupying its property as tenants. It had some 200 investing stockholders alone who were making monthly payments on their stock. It had about 125 stockholders who had secured loans upon their stock and who were making monthly payments of dues and premiums upon their stock and interest on their loans. It had tenants in about 30 buildings, dwellings and business houses, belonging to it, paying rent monthly. It had numerous debtors to whom it had made loans who were, from time to time, discharging such loans through said agency. Its business involved the collection and handling of large sums of money monthly which were paid in from day to day throughout the month. An office was and had been for years maintained in Chillicothe wherein plaintiff's business was handled, known as that of plaintiff, with its name advertised on a large sign above the front door and over the entrance thereof. The telephone in said office was carried in the telephone directory in plaintiff's name, and people calling over the telephone for the office called the name and the number of plaintiff. The office and place of business were advertised in the newspapers and generally known in the community as plaintiff's. A bank account was maintained in the Citizens National Bank of Chillicothe in the name of plaintiff by G. Watts as agent, in which were deposited the proceeds of the collections made by the agency for plaintiff from all sources from day to day as made and against which the agency drew checks to which plaintiff's name was signed as payee by the McCalls as its agents. Toward the end of each month, a check against said account with plaintiff's name by the McCalls as agents signed thereto as drawee was drawn and forwarded by the agency to plaintiff

for the balance remaining in said account at such time due plaintiff. In making collections, sometimes cash was received by the agency and sometimes checks payable to the McCalls as agents but more frequently to plaintiff or its order, which checks were endorsed with the name of plaintiff by the McCalls as its agents and deposited to the agency account in the name of plaintiff, G. Watts agent, with the Citizens National Bank. Sometimes the endorsements were made with a rubber stamp provided for use by the agency and sometimes in writing by the person making the endorsement. This course of business was continuous throughout the agency of the McCalls, from the appointment of Mrs. McCall in the year 1930 down to the transaction in question. Subsequent to the employment of Miss Coult, the office business of the agency appears to have been very largely left to and conducted by her. Both Mr. and Mrs. McCall were frequently absent from the office, and Miss Coult was left in full charge thereof. She attended generally to all of the business of plaintiff coming into the agency. The business intrusted to her was such that its care and transaction involved a relationship of agency between herself and plaintiff and was such as to make her employment by Mrs. McCall an appointment as subagent. The business continuously transacted by her involved not only liability upon the part of plaintiff for her acts in connection therewith, but authority from plaintiff for its transaction. Such business was openly and notoriously transacted by her with full knowledge upon the part of plaintiff and the public. She made collections from all sources, when offered, not only in cash, but in checks payable to plaintiff, in payment of dues, loans, and other obligations to plaintiff, and endorsed the checks with plaintiff's name by the McCalls as agents thereon, either in her own handwriting or by the use of the rubber stamp provided and used in the offices. She collected rents and delivered receipts therefor in the name of the McCalls as agents; she collected dues on stock and entered the collection of the same in passbooks held by the stockholders and indicated her connection with the collection of such dues and interest by writing her name as the person receiving the same upon the passbook opposite the entry of said collection. A passbook was kept with the bank showing the deposits made to the account kept therein for plaintiff by the agency. She collected loans due the company, the interest thereon, payments on the principal from time to time, and payment of the principal in full at times. The keeping of the bank account seems to have been left largely to her. She usually attended to the making of all deposits therein, including not only cash and check items received by her but cash and check items received by the McCalls directly.

An auditor for the plaintiff company was frequently at the office of the agency, who audited the passbooks of the stockholders. He

was frequently present at times when Miss Coult was engaged in the performance of her duties (making collections, receiving payment of obligations, and accepting checks in payment of dues and obligations) and had every opportunity of knowing what she was doing. From an examination of the stockholders' passbooks, he could ascertain her activities in the collection of dues and premiums. Moreover, the secretary of the company, Mr. Carter, was frequently present when she was engaged in such duties and had an opportunity of knowing fully what she was doing.

8. A general agent is one whom one puts in his place to transact all of his business in a particular line. [Liddell v. Sahline, 55 Ark. 627, 17 S. W. 705.] Such agent has all of the authority over the transaction of such business as the principal had. [Baker v. Kansas City St. J. & C. B. R. Co., 91 Mo. 152, 3 S. W. 486.]

A general agent is one who is employed to transact generally all of the business of the principal in regard to which he is employed, or in other words to do all of the acts connected with the particular trade or business with which he is intrusted or for which he is employed or to transact all of the business of his principal of a particular kind or in any particular place. [2 C. J., art. 15, p. 427.]

Usually, where authority is given to do a certain act or accomplish a certain purpose, it is construed to include all incidental acts necessary and essential to the proper execution of the duties of such agency; and, where general authority is given to conduct the business, the authority given extends to the doing and performance of all acts necessary to conduct such business. [Baker v. Kansas City St. J. & C. B. R. Co., supra.]

The fact that the authority of an agent is limited to a particular business or to a particular place does not make it special, as it may be as general in regard to the business as though its range were unlimited. [2 C. J., art. 15, pp. 427 and 428; Cross v. Atchison, Topeka, & Santa Fe Ry Co., 71 Mo. App. 585; Kissell v. Pittsburg, Ft. W. & C. R. Co., 194 Mo. App. 346, 188 S. W. 1118.]

Neither is an agency any less a general agency because it does not extend over the whole business of the principal. A man may have many general agents, one to transact business in one line, another in another line, and still others in other lines. The distinction between a general agency and a special agency is that the one is created by power given to do acts of a class and the other by power given to do individual acts only. [Cross v. Atchison, Topeka, & Santa Fe Ry. Co., supra; Commentaries on the Law of Agency by Story, sections 17, 18, 19.]

The purpose of a special agency is ordinarily for the accomplishment of a single transaction or a transaction with designated persons, while the purpose of a general agency is for the accomplishment of a

series of transactions and involves continuity of service. [Kissell v. Pittsburg, Ft. W. & C. R. Co., supra.]

General authority was given by plaintiff to its agent Mrs. McCall to conduct certain lines of its business in Chillicothe; and, in the transaction of such business, she had the same exact authority as plaintiff had, or would have had had it itself undertaken to transact such business. She had the right to demand cash in payment of premiums and other obligations due plaintiff which she collected and the right to accept checks therefor payable to the order of plaintiff, where she was not forbidden by plaintiff, the same as plaintiff might have had if it had conducted such business. In instances where she accepted checks payable either to herself as agent or to plaintiff, she had the same right to endorse said checks and reduce the same to cash, for the purposes of the agency, that plaintiff had or would have had if it had conducted such business.

In other words, the entire management of said business was left to her; and she was the *alter ego* of the plaintiff with respect to such business and the manner in which it was handled. Her husband, F. M. McCall, and Miss Coult had the same apparent authority as did Mrs. McCall, judged from the acts done and performed by them in the transaction of plaintiff's business in the regular course of business between them and plaintiff. The plaintiff must have known, from the nature and the character of the business intrusted to its agents at Chillicothe and the extent thereof, that such business necessarily involved the acceptance of checks in payment, or at least in conditional payment, of premiums and other obligations due it.

9. Its relationship to the business of such agency was such that it cannot be heard to say that it was ignorant that such business involved the acceptance of checks as well as cash and that its agents were daily accepting checks payable to themselves as agents or payable to it under some name and endorsing the same and depositing the same in the bank to its credit and checking in its name against such deposit. The business of the agency was at all times open to it for examination and inspection. It regularly sent its auditor, who had every opportunity to check up the business of the agency. Its secretary and other officers were visitors on frequent occasions and had every opportunity to know in what way the business of such agency was being conducted and by whom. It knew not only of the activities of the McCalls, but the activities of Miss Coult and the character of the acts done by her for it in the transaction of its business. The certificates of stock, dues upon which she collected, were issued from its home office. Loans upon which she collected interest were held at plaintiff's home office. Loans upon which she collected principal were held by plaintiff at its home office and forwarded to the agency for collection.

10. General authority to conduct a business involving the acceptance of checks in payment of necessity involves authority to the agent, unless forbidden so to do, to accept in conditional payment checks which said agent has good reason to believe will be honored on presentment and to endorse the same in the course of business intrusted to his care. [Cunningham v. Wabash R. Co., 167 Mo. App. 273, 149 S. W. 1151; Sublette v. Brewington, 139 Mo. App. 410, 122 S. W. 1150; 2 C. J., art. 267, p. 629, and art. 280, pp. 636-7-8, and art. 281, pp. 638-9; Edwards v. Thomas, 66 Mo. 468, 482.]

In 2 C. J., art. 267, p. 629, it is said: "General authority to conduct a business involving the acceptance of checks and notes will of necessity involve implied authority to take and indorse such paper in the course of the business intrusted to the agent."

In Hackett v. Van Frank, 105 Mo. App. 384, l. c. 393 and 394, 79 S. W. 1013, it is said: "An agent may possess direct authority to bind his principal in a particular transaction; that is to say, the principal may expressly empower the agent to bind him; and this direct authority will carry with it—such powers as are suitable and reasonably necessary to accomplish the intended purpose, though no secondary or incidental powers were mentioned between the principal and the agent. Then, too, the custom of business will commonly endow an agent appointed to a position of trust, as, for example the cashier of a bank, or to transact an affair, like the adjustment of an insurance loss, with all the authority agents of the kind usually have; and the appointee's acts, within the scope of the customary authorities will bind the principal unless he imposed restrictions which were known to the party dealt with. All the implied powers attributed by law to an agent whether as necessary to the efficient discharge of his main duty, or as habitually exercised by persons discharging such a duty, have the effect of authorities actually conferred, though in fact they were not."

Implied agency is actual agency which is to be established by proof of circumstances bearing on the question; that is, by deduction or inference from other material facts in the case. Implied authority is such authority as the principal, in fact, intends his agent to have, although he does not directly confer such authority. The authority is nonetheless actual because implied; and, when there is proof of facts which reasonably support the implication that the principal having expressly given his agent certain authority intended at the same time that the agent be invested with authority to do all acts which were necessary to the accomplishment of the main purposes of the agency, then the one asserting the fact of agency discharges his burden of proof as to the agency; and the issue is one of fact for the judge or the jury. [Thimmig v. General Talking Pictures Corp.

(Mo. App.), 85 S. W. (2d) 208, l. c. 211; Hackett v. Van Frank, supra.]

11. Whether the McCalls and Miss Coult had actual authority to endorse checks payable to plaintiff or to do and perform other acts in the name of plaintiff is not to be determined alone from the written contract between Mrs. McCall and plaintiff, but is to be determined from what was done by them through a long period of time with the knowledge and acquiescence of the plaintiff. [Austin-Western Road Machinery Co. v. Commercial State Bank (Mo. App.), 255 S. W. 585.]

The scope of the agency may be shown by facts and circumstances in evidence involving a course of business between the plaintiff and the McCalls and Miss Coult. [Meux v. Haller, 179 Mo. App. 466, 162 S. W. 688; Law Reporting Co. v. Elwood Grain Co., 135 Mo. App. 10, 115 S. W. 475; Mead v. South Side Bank (Mo. App.), 14 S. W. (2d) 664.]

Usually, no inference of recognition or acquiescence can be drawn unless it appears that the alleged principal had knowledge of what was assumed to be done in his name or on his account. This knowledge need not be expressly shown. The act may have been so public or so closely related to the alleged principal that he could not be said to be ignorant of it. Where the acts are of such a nature and are so continuous as to justify a necessary inference that the alleged principal knew of them and would not have permitted them if unauthorized, they become competent evidence of agency. [1 Mechem on Agency, (2 Ed.), ch. 5, sec. 266 and 280.]

12. Where the principal puts the agent forward as a general agent or places him in a position where others are justified in the belief that his powers are general, the restrictions that may be imposed privately on the agent are immaterial, except as between the principal and the agent, and cannot affect the rights or remedies of third parties dealing with the agent who have no knowledge of such restrictions or limitations. [Southwest Missouri Electric R. Co. v. Missouri Pac. R. Co., 110 Mo. App. 300, l. c. 309, 85 S. W. 966; Baker v. Kansas City, St. J. & C. B. R. Co., supra.]

13. From the course of business pursued by the agency, it is clear that it not only made collections of the items due plaintiff in cash and in checks but endorsed the checks and deposited the same to the credit of plaintiff in its bank account and forwarded the amount of such collections due plaintiff monthly to plaintiff. This latter duty was uniformly performed by checks drawn against the account in the bank in the name of the plaintiff, such name being signed thereto by the McCalls as its agents as drawers of said checks. This appears to have been the ultimate and final purposes of the agency —that is, to forward to plaintiff in cash the net results of the

agency's work for the month. To accomplish such purpose, the agency had authority to perform any and all acts in connection therewith reasonably necessary for its accomplishment. If, in the first instance, it accepted a check of a customer or a debtor, it had the right to reduce said check to cash in order to deliver the proceeds of such collection to plaintiff in cash. The acceptance of checks in the ordinary routine of its business did not exhaust the power and authority of the agency. It had the further power and authority to convert the checks into cash for plaintiff. This could be done only by the endorsement of the same by the agency. Moreover, the acts of the agency in accepting checks and in endorsing the same were so continuous and of such nature as to justify a reasonable inference that plaintiff knew of such acts and would not have permitted the same if unauthorized. Such acts of the agency in such regard were so closely related to the plaintiff and so continuous and so discoverable by plaintiff, considering its relation to such agency, that it must be charged with knowledge of such acts. The acts of the agency in endorsing the checks received by it were clearly within the scope of the authority conferred on it by plaintiff.

It is true, as contended by plaintiff, that it is held as a general rule that, to authorize an endorsement by the agent of commercial paper payable to the principal, the agent's authority must be express. Express authority may be shown by proof of facts and circumstances from which it may be inferred. That it is to be inferred from the facts and circumstances in evidence in this case, appearing in the record, is not to be doubted.

14. If a one without right assumes to act for another, the act will be attributed to and affect the person represented if he accepts and adopts it. The plaintiff knew of the acts of the McCalls and Miss Coult in connection with the transaction of its business at Chillicothe. Its accepted, acquiesced in, and adopted their acts as its agents and is bound thereby. It cannot now be heard to say that such acts by them were unauthorized.

15. It must therefore be held that the authority of the McCalls and also of Miss Coult, as agents of plaintiff, to accept and endorse the checks in question and present them for payment and to deliver the release deed in question is fully established by the evidence in the record and, further, that plaintiff, from its course of business and that of the McCalls and Miss Coult (they in assuming to act as such agents and plaintiff in permitting them to hold themselves out to the public as such agents with authority to do and perform the acts performed by them), is now estopped to deny their agency and their authority.

16. Second, as to the question of due diligence on plaintiff's part

in the presentment for payment of the checks in question to the First National Bank of Chillicothe—

The law seems well settled that the acceptance by one from his debtor of a check as other than absolute payment implies an undertaking on the part of such one to use due diligence in presenting the check for payment and giving notice of dishonor. If such one is guilty of laches or want of due diligence whereby the drawer of the check is prejudiced, the check operates as payment of the indebtedness for which it was given, at least to the extent of the drawer's loss, unless such want of due diligence is in some manner excused. [48 C. J., arts. 53 to 56, inclusive.]

The indebtedness is not discharged, however, when, before the expiration of a reasonable time after its delivery and acceptance within which to present the same for payment, the bank on which it is drawn fails. [48 C. J., supra.] Our statute, section 2814, Revised Statutes of 1929, provides: "A check must be presented for payment within a reasonable time after its issue or the drawer will be discharged from liability thereon to the extent of the loss caused by the delay." By section 2824, the same revision, it is provided: "In determining what is reasonable time or an unreasonable time, regard is to be had to the nature of instrument, the usage of trade or business, if any, with respect to such instrument, and the facts of the particular case."

The question then arises as to what is a reasonable time for presentment under the laws of Missouri and as to whether there is any period of time fixed as reasonable within which a check must be presented for payment that is applicable in all cases; and, if not, then how is such reasonable time to be determined and what matters are for consideration in its determination in any particular case.

At common law and under the law as declared by the courts in Missouri, the rule appears established that, where a check is delivered by the drawer to the payee in the same place where the bank on which it is drawn is located, a reasonable time for its presentment, where no cause for delay appears, is within the banking hours on the day of its delivery or on the next day after its delivery. [Rosenblatt v. Haberman, 8 Mo. App. 486; Dyas v. Hanson, 14 Mo. App. 363; Farmer's National Bank v. Dreyfus, 82 Mo. App. 399; Wear v. Lee, 87 Mo. 358; Maxwell v. Dunham (Mo. App.), 297 S. W. 94; Koch v. Sanford Loan & Realty Co., 220 Mo. App. 396, 286 S. W. 732; Missouri Pac. R. Co. v. H. M. Brown Coal Co., 226 Mo. App. 1038, 48 S. W. (2d) 86.]

But, where a check is drawn on a distant bank or on a local bank to be sent to the payee at a distant point, then it should be forwarded for presentment and collection on or before the next day after its delivery. [Farmers' National Bank v. Dreyfus, supra.]

What is a reasonable time is a question of law for the court where the facts are undisputed; where the facts excusing delay are disputed, the question is one for the trier of the facts. [Farmers' National Bank v. Dreyfus, supra.]

17. Plaintiff contends, however, that the rule thus established relating to the time within which checks must be presented for payment has been abrogated and no longer exists in Missouri; that such matter of time is now regulated by sections 2814 and 2824, Revised Statutes of 1929, above noted (parts of the Negotiable Instrument Act), and by section 5571 of the Bank Collection Code of the same revision; that what is a reasonable time is now made to depend on the usage of trade and business, if any, with respect to the handling and presentment of checks and the facts of the particular case; that the usage, custom, and practice of collecting through a clearing house are now authorized as a part of the collection code; and that, where such channel is employed, consideration must be given thereto.

We are not of the opinion that the rule as to what is a reasonable time under the common law and under the law as declared by the courts of last resort in our State for presentment of checks given by the drawer to the payee in the same place as the drawee bank is located has been changed by such sections. The rule as to such reasonable time is the same since the adoption of the Negotiable Instrument Act and the Bank Collection Code as it was prior thereto. The Negotiable Instrument Act is simply a codification of the prevailing rules on the subject before its adoption. No new rule is established or laid down. [Gordon v. Levine, 194 Mass. 418, 80 N. E. 505, 10 L. R. A. (New Series) 1153; 5 R. C. L., sec. 31, p. 508; Zaloom v. Gamin, 129 N. Y. S. 85, 1. c. 90, 91.]

Thus, it was said in Gordon v. Levine, supra, 1. c. 1154 of 10 L. R. A. (New Series), in which sections of the Negotiable Instrument Act of the State of Massachusetts similar to sections 2814 and 2824 of our statute were under review:

"This, however, would not seem to lay down or to establish any new rule. The nature of the instrument and the facts of the particular case have always been considered in passing on the question of reasonable or unreasonable time. In deciding, therefore, whether this check was presented within a reasonable time, if presented on Friday, resort must be had to the rules which have been hitherto established in similar cases. And one of the rules which have been established is that where the drawer and the drawee and the payee are all in the same city or town, a check, to be presented within a reasonable time, should be presented some time before the close of banking hours on the day after it is issued, and that its circulation from hand to hand will not extend the time of presentment to the detriment of the

drawer.'' [Zaloom v. Gamin, supra; Anderson v. Elem (Kan.), 208 Pac. 573; 5 R. C. L., sec. 31, p. 508, supra.]

And so in Missouri, the nature of the instrument and the facts of the particular case, including the custom and usage of business with respect to the instrument, have always been considered in passing on the question of a reasonable or unreasonable time for presentment; and our Negotiable Instrument Act is merely a codification of the rules prevailing before its adoption.

18. That the custom of presenting and collecting checks through clearing houses has existed in Missouri from an early day is well known; and it has been judicially declared that the existence of such custom does not have the effect of extending the time within which local checks are to be presented beyond the day upon which such checks are delivered, within banking hours, to more than one day thereafter. [Rosenblatt v. Haberman, supra.]

In the case of Rosenblatt v. Haberman, supra, the check involved was presented for payment through the clearing house on the third day after its delivery; and payment thereof was not made for the reason that the business of the bank upon which it was drawn had been suspended. The evidence showed that, if it had been presented on the date of its delivery or the next day thereafter, it would have been paid. It was contended in that case that the custom of banks doing business through clearing houses had altered the ordinary rule that a local check must be presented to the bank on which it is drawn at least on the next day suceeding that on which the check is delivered. The court said, l. c. 487 and 488 of 8 Mo. App., supra, in answer to such contention: ''—there is no warrant for the assumptin that the time is extended. It is by the banks, and for their convenience, that clearinghouses are used, and the receiver of the check is not prevented from presenting it to the bank on which it is drawn. The effect of not so presenting the check, but of depositing it with his own banker, and thus allowing the banker to hold it, according to the usual course of business, for another day before it is presented to the drawee, the holder of the check is presumed to know, and to be willing to take the consequences of.''

The rule thus announced as to the effect to be given the custom of employing the channel of a clearing house does not seem to have been impeached in any manner by the decision of the courts in any case, whether rendered before or since the adoption of the Negotiable Instrument Act or the sections of such act above noted.

In Dyas v. Hanson, supra, evidence as to the custom of certain wholesale merchants of St. Louis to deposit checks and drafts received by them from customers, drawn on banks in St. Louis, in some bank other than the bank upon which they are drawn and to present such checks or drafts through the bank in which deposited

was offered and was excluded by the trial court; and such action came under review. It was held in such case that such evidence was properly excluded and that such custom, if established, could have no effect in extending the time within which a check was required to be presented beyond the date of its delivery within banking hours of the next succeeding day.

It was also held in that case that, where a bank receives a draft for collection drawn on a party having a place of business in the same city in which such bank is located, it does not use due diligence if it fails to present the draft for payment before the close of the following day.

The cases of Rosenblatt v. Haberman, and Dyas v. Hanson, supra, were decided prior to the adoption of the Negotiable Instrument Act. The holding in these cases is in harmony with the general law and numerous decisions of other courts.

Thus, in 2 Morse on Banks and Banking (5 Ed.), sec. 424, p. 12, it is said: "A custom among banks to do business through the clearing house does not do away with the necessity of presenting a check to the bank on which it is drawn, at least during banking hours of the next succeeding day, or within a reasonable time."

In 3 Michie on Banks and Banking (1913 Ed.), ch. 18, sec. 321, pp. 2287 and 2288, it is said: "The rules of a clearing house association are adopted solely for the purpose of facilitating exchanges among banks, which are its members. They do not affect the rights and liabilities of banks and persons who are not members of the association or parties to its regulations. The regular customers of and depositors in banks are not parties to the rules and regulations of a clearing house of which such banks are members, and are not, therefore, in a situation to claim the benefits of them, nor liable to be injuriously affected by them."

The rules of a clearing house, as such, do not govern the rights of a drawer or a payee of a check who are not members of a clearing house and do not control with express reference to such rules.

In 8 C. J., sec. 753, p. 542, it is said: "The time for presentment of checks is not modified or extended by reason of the establishment of a clearing house system between the banks and of a clearing house rule purporting to authorize the holding over of checks at a bank, where presented through the clearing house, until the day after their receipt by such bank."

In Columbia-Knickerbocker Trust Company v. Miller, 215 N. Y. 191, 109 N. E. 179, l. c. 180, it is said: "We do not consider it necessary to construe the constitution and rules of the Clearing House Association, which is a mere agency adopted by its members to facilitate exchanges and the adjustment of accounts as between themselves. We agree with the contention of the defendant that he was

not bound by the rules of the association to which he did not belong. Neither could he claim the benefit of them.''

In 'Edminsten v. Herpolshemier Co. (Neb.), 59 L. R. A. 934, the court held that the collection of a check through a clearing house would not relieve the payee of the necessity of presenting it the following day. The court said that the special circumstances that will excuse delay in presentment must be such as are beyond the control of the holder of the same or must be by reason of some agreement of the parties. To the same general effect is Dorchester v. Merchants' National Bank of Houston (Texas), 163 S. W. 5.

In Merchants' National Bank v. National Bank of the Commonwealth, 139 Mass. 513, the court held that the rules and course of business of the Boston Clearing House Association were adopted solely for the purpose of facilitating exchanges and adjustments of accounts between banks and that the customers are not parties and are not bound by such rules and course of business unless expressly so understood.

19. Moreover, so far as custom is concerned, it is generally held that it cannot be given the effect of abrogating or repealing a fixed law. [American Exch. Nat. Bank v. Metropolitan Nat. Bank, 71 Mo. App. 451, l. c. 458; Shafir v. Carroll, 309 Mo. 458, 274 S. W. 755; Syme-Eagle & Co. v. Joplin Grocer Co., 206 Mo. App. 357, 229 S. W. 246.]

Furthermore, a custom must be pleaded; and that the party sought to be affected thereby knew of such custom and contracted with reference thereto must also be pleaded. No such custom as that relied upon by plaintiff is pleaded.

The early cases in Missouri—Wear v. Lee, supra; Farmers' National Bank v. Dreyfus, supra; Bank of Springfield v. First Nat. Bank of Springfield, 30 Mo. App. 271; Herider v. Phoenix Loan Assn., 82 Mo. App. 427—do not discuss the custom of banks as to clearing houses. but lay down the general rule that, if a check is drawn on a bank at the place where delivered to the payee, it should be presented on or before the next day after it is drawn and delivered, although the custom among banks to present .through clearing houses prevailed at the time they were decided. These cases were all decided before the Negotiable Instrument Act, but they state the general rule without an exception.

In Koch v. Sanford Loan & Realty Co., supra, the same rule is laid down as in the cases of Wear v. Lee, supra; Rosenblatt v. Haberman, supra; Dyas v. Hanson, supra; Bank of Springfield v. First Nat. Bank of Springfield, supra; Farmers' Nat. Bank v. Dreyfus, supra; Herider v. Phoenix Loan Assn., supra; but it makes no reference to any exceptions or to the usages and customs of banks and

clearing houses extending the time for presentment by the payee and his bank when collection is made through a clearing house.

In Maxwell v. Dunham, supra, the opinion refers to evidence in the record showing the deposit of the check involved and showing that it passed through clearing house channels; but, in that case, the check was presented to the bank on which it was drawn the day following delivery; and, it being thus presented within a reasonable time under the established rules, no question was involved as to an extension of the time by reason of its passing through a clearing house.

In the case of Missouri Pacific R. Co. v. H. M. Brown Coal Company, supra, the question of the custom of collecting through clearing houses or other banks, whereby the time for presentment of local checks was extended, was not discussed.

Plaintiff cites the cases of Maronde v. Vollenweider, 220 Mo. App. 67, 279 S. W. 774; McIntyre v. Live Stock Shipping Assn. (Mo. App.), 11 S. W. (2d) 77; First Nat. Bank v. Korn (Mo. App.), 179 S. W. 721. Such cases, however, are not in point. They involve checks drawn on distant banks and involve the rule of the "ordinary course of business," applied by our courts in such cases, which has no application in a case where the check is local (that is, drawn by a drawer to a payee where both drawer and payee live in the same town with the bank on which it is drawn).

There is a difference between the rules to be applied to the collection of local checks and those drawn on distant banks. [Daly v. Butchers' & Drovers' Bank, 56 Mo. 94, l. c. 102; Dyas v. Hanson, supra; Farmers' Nat. Bank v. Dreyfus, supra.] The reason for the difference lies in the fact that a check drawn on a local bank, where the drawer, the payee, and the drawee bank are in the same place, may be presented by the payee or holder direct to the drawee bank without the intervention of an agent and the fact that the payee may deposit the check in a bank of his own selection, other than the bank on which it is drawn, and make such bank his agent does not have the effect of extending his time for presentment while, in the case of a check drawn on a distant bank or drawn on a local bank to be sent to a payee at a distant point, the drawer thereof must be held to contemplate the usage in such instances of forwarding such check for collection through an agent and of transmitting it to another or distant bank in the usual course of business for such purpose.

20. We have already held in the instant case that the act of plaintiff's agents in Chillicothe in accepting the checks in question at such point, drawn on the First National Bank of Chillicothe, at the same place in which they lived and the same place in which the drawers lived, was the act of plaintiff and that such checks were delivered

to plaintiff in Chillicothe. The rule as to local checks must therefore be applied.

8 C. J., sec. 753, page 540, says: "It is well settled that, in the absence of special circumstances, when the person receiving the check and the banker on whom it is drawn are in the same place, it must be presented for payment the same day or at least the next business day after it is received." [See also authorities to the same effect hereinbefore cited.]

21. Plaintiff further contends that such established rule relating to the time within which checks must be presented for payment is abrogated by the enactment of section 5571 of the Bank Collection Code and that the law of Missouri relative to the deposit of checks has been changed by such section. However, whatever changes it may have otherwise wrought, we are unable to discover where such section of the Bank Collection Code has changed the rule relating to the reasonable time within which a check is required to be presented by the payee, after delivery by the drawer, where the same is a local check drawn by a drawer and made payable to a payee upon a bank located in the same place with such drawer and payee. Such section does not seem to lay down any rule or rules in contradiction of sections 2814 and 2824, Revised Statutes of 1929, supra, or the rule established by our courts relating to the reasonable time within which a local check must be presented and to the usage relied upon by the drawer in making presentment of such check through such methods as will result in such presentment at least upon the day following its delivery.

The Bank Collection Code, upon which plaintiff relies, is designed to secure a uniform code of laws and rules in the various states governing the subject of bank collections (after the fashion of uniform laws on the subject of negotiable instruments, bills of lading, and the like) and to establish and preserve an agency relation between the bank receiving the check on deposit and the person depositing the check rather than to permit the passing of the title of the check to the bank. [Farmers' Exchange Bank v. Farm & Home Savings & Loan Assn., 332 Mo. 1041, 61 S. W. (2d) 717.]

Such code is a codification of existing laws and decisions; but, where conflict existed, the law is changed where necessary to secure uniformity. There is no conflict appearing in the law in Missouri as declared by our courts and sections 2814 and 2824, Revised Statutes of 1929, supra, and section 5571, above mentioned, relied on by plaintiff, or by any other section of said code so far as the same relates to the reasonable time within which a local check is required to be presented by the payee. Such section 5571 does not affect the relationship between the drawer of a check and the payee therein who deposits it. It does not undertake to alter the reasonable time for presentment by the payee from the time of delivery to him by the drawer as it

has been heretofore established by our courts. It undertakes only to define the liabilities between the bank in which a check is deposited for collection, in making such collection, and the person who deposits it therein; to create the relationship of agency between such bank and the depositor; and to define a reasonable time within which such agent bank may present such check, after deposit therein, to the drawee bank, as between the depositor and itself, to be at any time not later than the next business day, by presentment to the drawee bank directly at the counter thereof or through the clearing house. The agent bank in thus handling such check does not become liable to the drawer thereof on account of any loss sustained by reason of its not being presented for payment upon the day of its delivery or the day thereafter, nor is the original liability of the payee of such check to the drawer thereof for any loss thereon by reason of its non-presentment upon such dates in any manner affected. It is solely a matter between the payee or depositor and the bank of deposit and such bank is liable to the payee or depositor for any loss sustained by the payee only if it fails to act with due diligence and within the time prescribed by such section. In other words, the drawer of the check is not in any manner affected by the provisions of the code unless he himself be the depositor of the instrument as in the case of a draft drawn by him on some other bank or person.

If the payee chooses to collect through an agent and extend the time another day, by waiting until the next day after receiving the check to deposit it for collection, then any loss sustained by the delay should be his. The right of the drawer of the check to insist upon the requirement, under the established rules of law, that it be presented on the day of its delivery or upon the day following is not affected by such section. He may still insist upon it; and the payee in such check or the holder thereof, if he fails to meet such requirement, does so at his peril.

22. In the instant case, the checks were delivered on the afternoon of June 19, within banking hours and in time to have been presented for payment to the drawee bank on that date or to have been deposited in plaintiff's depository on that day or early on the day following and cleared through the clearing house the following day. The clearing house met at 10 or 10:15 o'clock each morning, and all checks deposited up to the hour of the meeting appear to have been customarily cleared through it. The checks were delivered by the drawers, so far as the record shows, under the prevailing usage, by which they were to be presented with due diligence to the bank upon which they were drawn on the day of their delivery or the following day. The evidence shows that, had they been so presented according to the established usage, they would have been paid. The evidence in the record shows that there were more than sufficient

funds on deposit in the First National Bank of Chillicothe to the credit of the drawers of said checks to pay them and that the drawee bank had sufficient funds on hand during all of the day on which said checks were delivered and on the following day with which to have paid the same in the regular course of its business and would have paid the same in the regular course of its business if they had been presented on either of said dates. Instead of presenting the checks to the drawee bank on the day on which they were received or the following day, in person or by messenger, and instead of depositing said checks with its depository on the day on which they were received or in time on the following day to present the same through the clearing house, plaintiff waited until after the clearing house for the following day had met and cleared and adjourned and then deposited such checks too late for clearance and presentment on that day. This was not in accordance with the usage under which the drawers of the check delivered them. The drawers of such checks did not agree to any method of presenting the checks that involved a longer time than the day on which they were delivered or the day thereafter. The First National Bank, the drawee, was open for business on both the day on which said checks were delivered and the day thereafter until the closing hours thereof. It did not thereafter reopen for business so that said checks could thereafter be presented and paid. It was taken over by the Comptroller of the Currency for the United States for the purposes of liquidation and is still in liquidation. Due diligence was not used by plaintiff to present the checks within a reasonable time. Any loss sustained by the drawers of the checks must fall on plaintiff.

23. Plaintiff, in support of its contention that where a check is deposited in the bank for collection in the same place as the bank on which it is drawn on the day following its receipt and is presented for payment through the clearing house on the day following its deposit such presentment is within a reasonable time and the owner is not chargeable with lack of diligence, cites: Loux et al. v. Fox et al., 33 Atlantic 190; Zaloom v. Gamin, supra; Clarke v. Davis (Idaho), 281 Pac. 3; Bistline v. Benting (Idaho), 228 Pac. 309; Federal Land Bank of St. Louis v. Goodman (Ark.), 292 S. W. 659; George H. McFadden Bros. Agency v. Keesee (Ark.), 16 S. W. (2d) 994; Bay City Bank v. Concordia Mutual Fire Ins. Co. (Mich.), 245 N. W. 532.

In the cases of Loux et al. v. Fox et al., supra; Zaloom v. Gamin, supra; Federal Land Bank of St. Louis v. Goodman, supra; Clarke v. Davis, supra; Bistline v. Benting, supra, the checks involved were received by the respective payees after banking hours on the dates of their delivery and deposited by such payees in their respective depositories on the days next following their respective deliveries and by such depositories were presented to the respective drawee banks

for payment on the days next following their deposits. It was held in each of these cases that the checks, not having been delivered until after banking hours on the day of their issue, such day was not to be counted in the question of due diligence in presentment and that, in eliminating such day, the checks were presented within reasonable time. Such cases have no application to this controversy. The checks in question in the instant case were delivered around two o'clock on the afternoon of the date of their issue and within banking hours and within time for deposit or presentment.

We do not consider the cases of Bay City Bank v. Concordia Mutual Fire Insurance Company, supra, or George H. McFadden Bros. Agency v. Keesee, supra, as pursuasive under the law in our State. At least, they are not controlling, and we will not follow them. In the George H. McFadden Bros. Agency Case, the rule followed by the courts generally, that the Negotiable Instrument Act is merely declaratory of the common law, and the court opinions based thereon, were not followed by the court; but, in order to reach the conclusion that the check in question therein had been presented in due time, it reversed decisions made prior to the adoption of the act. Such case does not, therefore, appear to be in harmony with the opinions generally of the courts of other states.

In the case of Bay City Bank v. Concordia Mutual Fire Ins. Co., supra, the Negotiable Instrument Act and the Bank Collection Code similar to, if not the same, as in our State were given an effect which we can not give to such in our State. The check in that case was a local check (that is, a check drawn on a bank in the same place in which both the drawer and the payee resided). The court therein held that the time for its presentment was extended by the code beyond the date of its delivery and one day thereafter and that its presentment could be made in due time on the third day after its issue. The code, in our opinion, is not subject to such construction or to being given such effect.

24. The plaintiff complains of the admission upon the trial of evidence regarding the acts of Phelps and Griffiths, former agents of plaintiff at Chillicothe. The evidence shows that plaintiff maintained the agency at Chillicothe, known as the Chillicothe District Agency, for many years for the transaction of its business, of the same kind and character as that intrusted to the McCalls by it; that one J. M. Phelps was first agent in charge of such agency; and that he was succeeded by W. Y. Griffiths, who, in turn, was succeeded by the McCalls. The evidence shows that the duties of Phelps, Griffiths, and the McCalls as agents were the same, or at least were the same in character, and covered much the same territory and that they each exercised the same authority. So far as the public was concerned, it could not have told that there was any difference, if any in fact existed.

The acts of Phelps and Griffiths and their associates and the acts of the McCalls and their associates in the conduct of the agency and the business transacted by them through it for plaintiff were of the same kind and character and were continuous in course of time, from the beginning of Phelps' activities and through the activities of Griffiths and the McCalls, practically to the day of the trial. The habit and course of business with respect to all business transactions through the agency, from its beginning, between plaintiff and Phelps and between plaintiff and Griffiths and between plaintiff and the McCalls, were the same. Plaintiff knew of all such activities on the part of each of such agents and their associates, acquiesced therein, and accepted the benefits thereof, alike.

We think that such evidence was properly admitted. It had a tendency to show a uniform habit and course of business on the part of plaintiff with respect to the agency at Chillicothe and the persons in charge thereof as its agents and to show further that the acts of the McCalls and Miss Coult, relied upon by defendants to show their authority to do the acts performed by them, were the same as those performed by Phelps and Griffiths, former agents, and their associates throughout a long period of time, of which plaintiff must have known and in which it must have acquiesced, and that such acts were within the scope of the authority intended to be and actually conferred by plaintiff upon its agents, from time to time in charge of such agency, including the McCalls and Miss Coult. In other words, it had a tendency to show the apparent authority of the McCalls and Miss Coult to do the acts performed by them in the name of plaintiff, as its agents within the scope of their agency, from the fact that such acts were the same as those which had been uniformly performed by the previous agents in charge of such agency and uniformly permitted and acquiesced in by plaintiff.

It is true, of course, that the authority of the McCalls and Miss Coult must rest upon the general authority given them by plaintiff and the acts done by them through the continuance of the agency (of which plaintiff knew or should have known and in which it acquiesced and of which it accepted the benefits), which acts it ratified. In other words, as far as their particular authority is concerned, it must rest alone on the authority given them and the habit and course of business between themselves and plaintiff.

25. Plaintiff complains as to the admission of evidence, by the McCalls and their employee, of the endorsement of other checks payable to plaintiff and complains that evidence of the acts alone of the agents was inadmissible to prove their authority.

We do not consider such objection well taken. Such evidence was admissible for the purpose of showing the course of conduct between the plaintiff and such parties as its agents. The evidence was such

that plaintiff must have known, by reason of its relationship to the agency at Chillicothe (which was at all times open to its inspection and examination) and from the nature of the business transacted by the agency for it, that such agency and the McCalls and Miss Coult as its agents received checks payable to plaintiff and necessarily endorsed them in order to get the cash thereon to remit to plaintiff. We think there is sufficient knowledge shown on plaintiff's part of the acts of the McCalls and Miss Coult and of its acquiescence therein to show apparent authority on the part of the McCalls and Miss Coult to endorse the checks in question.

26. We are further of the opinion that the answers are broad enough not only to lay a foundation for evidence showing the apparent authority of the McCalls and their employee to endorse the checks in question but to lay a foundation for evidence building up an estoppel against plaintiff to deny such authority.

27. We are further of the opinion that the answers are broad enough to lay a foundation for evidence showing a general agency upon the part of the McCalls and Miss Coult to transact all of the business of plaintiff at such agency with general powers to do the acts relied upon by defendants. The authority of an agent need not be shown by direct evidence, but it may appear from the habit and course of business between such agent and the principal. The acts and conduct of an agent with reference to his principal's business in the line of the general course of business between such agent and his principal, with the knowledge and acquiescence of the principal, are evidence of authority in such agent to perform such acts, even though not expressly authorized; and, under such circumstances, the agent's acts are admissible as showing his authority. [Best v. Krey (Minn.), 85 N. W. 822; Columbia Mill Co. v. National Bank of Commerce (Minn.), 53 N. W. 1061; Mead v. South Side Bank, supra; Austin-Western Road Machinery Co. v. Commercial State Bank, supra; Thimming v. General Talking Pictures Corp., supra.]

Of course, we are not holding that agency may be established from the act of an agent standing alone, unauthorized by any knowledge upon the part of the person for whom such agent may assume to act or his acquiescence therein or ratification thereof; but, where the acts are frequent and continuous over a period of time, known to and acquiesced in and ratified by the person for whom such agent assumes to act, we have a different situation. From such a situation, agency is not only to be implied, but the purported principal is estopped from denying its existence.

Upon the entire record, the trial court did not err in holding that plaintiff was not entitled to the relief sought; in failing to hold that, under the evidence, there was no authority shown in Mrs. Gladys R. McCall, F. M. McCall, or Miss Coult to endorse the plaintiff's name

,on the checks received by them from defendants Stubbs payable to plaintiff; in failing to hold that Miss Coult, Mrs. McCall, and Mr. McCall, were without any authority to deliver the release deed described in evidence without the cash necessary to .effect such release being first paid them for plaintiff; in not holding that the filing of the release deed for record by defendants, after the dishonoring of the checks and after such dishonoring was known by them, was a fraud on the rights of plaintiff; and in failing to hold that there was no, negligence by plaintiff under the evidence in failing to present the checks for payment to the bank on which they were drawn. Nor did it err with respect to the introduction of testimony or in rendering judgment for the defendants.

The judgment of the circuit court is affirmed. *Shain, P. J.,* and *Bland, J.,* concur.