**Eula M. FIELDER, Plaintiff-Respondent,**

**v.**

**PRODUCTION CREDIT ASSOCIATION and Sentry Insurance Company, Defendants-Appellants.**

**No. 8773.**

Springfield Court of Appeals.

Missouri.

June 5, 1968.

---

Dalton, Treasure & Bullard, James C. Bullard, Kennett, for appellants.

Ford, Ford & Crow, Wendell W. Crow, Kennett, for respondent.

TITUS, Judge.

Bennie and Eula Fielder, husband and wife, performed services as janitor and janitress at the offices of Production Credit Association in Kennett, Missouri, from April 1, 1964 until April 3, 1965, on which latter date Mrs. Fielder fell and was injured. The Division of Workmen's Compensation entered an award declaring 65-year-old Eula had sustained permanent total disability as the result of the accident, and ruled Production Credit Association and its insurer, Sentry Insurance Company, liable for necessary medical aid in the amount of $818.29, for continuing medical care and treatment, and for the payment of compensation to Mrs. Fielder in the sum of $16 per week for 300 weeks and thereafter the sum of $18 per week for the remainder of her life. This award was affirmed on review by the Industrial Commission of Missouri, and its final award was affirmed upon appeal by the Circuit Court of Dunklin County. Production Credit Association and its insurer, in appealing from the circuit court judgment, complain: "I. The overwhelming weight of the evidence shows that Eula Fielder was not an employee of Production Credit Association. II. The Workmen's Compensation Referee erred by admitting hearsay testimony which was not admissible nor binding upon Production Credit Association. III. The

disability award by the Industrial Commission is contrary to the overwhelming weight of the evidence."

■ Respondent's motion to dismiss the appeal or affirm the judgment per Rule 83.09 [1] poses our initial onus. With accuracy respondent says appellants' brief does not contain "a fair and concise statement of the facts without argument" [Rule 83.-05(a) (2) and (c)], the "points relied on," supra in haec verba, do not undertake to show * * * wherein and why" the complained of actions were erroneous [Rule 83.05(a) (3) and (e); Bowers v. Spinaio, Mo.App., 421 S.W.2d 790, 791(3)], and the statement of facts and argument in the brief often omit "specific page references to the transcript on appeal" as required by Rule 83.05(a) (4) and (d). We note, sua sponte, that while Rule 83.05(a) (4) directs "all authorities discussed in the argument shall be cited under 'Points Relied On,'" appellants include twelve citations of authority in their brief under "Argument" which do not appear in their points. It is an eternal source of wonderment why counsel will accept a client's trust to appeal a cause and chance its banishment and accompanying embarrassment by noncompliance with the simple procedures prescribed by the Supreme Court. The compulsory verb "shall" is copiously employed throughout Rule 83.05, but Rules 83.09 and 83.24 were seemingly penned stilo inverso to permit modification of the rules if justice requires or to facilitate disposition of cases on their merits. Unless infraction of the rules be so gross as to incite incensement, the trend of appellate courts is toward tolerance. Of course, solicitude for the errant brief scribe is unjust to counsel who labor to observe the rules. Nevertheless, our primary concern is with the cause of the litigants and we reluctantly in this instance overrule respondent's motion.

■ Ere proceeding to the evidence, we first consider appellants' contention the referee "erred by admitting hearsay testimony which was not admissible nor binding upon Production Credit Association." This abstraction, according to the argument, alludes to testimony concerning conversations had by Mr. and Mrs. Fielder with Lawson Brents. Initial attempts to relate these verbal exchanges were thwarted because, at that time, there was no evidence independent of hearsay and Brents' extrajudicial declarations regarding his relationship to Production Credit Association. The order in which evidence is received lies largely within the discretion of the trial court, and the reception into evidence of testimony as to these conversations *after* Brents' sworn testimony established his agency with Production Credit Association is not inconsistent with the preliminary ruling of the referee. 31A C.J.S. Evidence § 344, p. 843; 29 Am.Jur.2d, Evidence, § 663, p. 715. Under this "point" appellants cite only Schwarze v. May Department Stores, Mo.App., 360 S.W.2d 336, 339(6), and Rosser v. Standard Milling Company, Mo., 312 S.W.2d 106, 110(2), each of which recites the accepted rule that neither the fact nor scope of agency can be established by the extrajudicial declarations of the alleged agent. Also see Linam v. Murphy, 360 Mo. 1140, 1149(3), 232 S.W.2d 937, 943(14); 3 Am.Jur.2d, Agency, § 354, p. 711; 29 Am.Jur.2d, Evidence, § 663, pp. 715–716. But the fact that such declarations may not be used to prove agency and the scope thereof does not mean agency and its bounds cannot be established on trial by the testimony of the agent himself. Crull v. Massman, Mo.App., 189 S.W.2d 1009, 1016; C.I.T. Corporation v. Hume, Mo.App., 48 S.W.2d 154, 157; 3 Am.Jur.2d, Agency, § 353, p. 711. "As a general proposition * * * the knowledge of the agent is imputed to the principal" (Kearns v. Sparks, Mo.App., 260 S.W.2d 353, 358), and "principals are presumed to have knowledge of all * * * declarations made by and to their agents when acting in relation to the subject mat-

1. All references herein to rules and statutes are to Supreme Court Rules of Civil Procedure, V.A.M.R., and to RSMo 1959, V.A.M.S.

ter of the agency and within the scope of an actual or apparent authority conferred." 3 C.J.S. Agency § 320h, p. 271. Consequently, "after the party alleging the agency has made a prima facie case of agency against the principal, any declarations made by the agent in the prosecution of, and relative to the business contemplated by such agency, are admissible against the principal." Peck v. Ritchey, 66 Mo. 114, 118(1); State ex rel. Kurz v. Bland, 333 Mo. 941, 949, 64 S.W.2d 638, 642; 29 Am. Jur.2d, Evidence, §§ 662–663, pp. 712–716.

Lawson Brents was called as an adverse witness by the respondent and testified he then was and had been since August 1963 Branch Manager of the Kennett office of Production Credit Association. His duties, inter alia, included interviewing job applicants "with respect to employing persons for the Kennett office." Brents related, "I have hired [employees] with the okay from the General Manager at Caruthersville." He said he was without authority to "fire or hire anybody without the general manager's okay," but there is no evidence the Fielders were ever aware of this limitation on Brents' agency. No disapproval was ever made of any recommendation by Brents for the employment of personnel, and when asked the identity of the person who told the only discharged employee "he was no longer needed," Brents testified, "I did."

Mrs. Fielder, shortly before April 1, 1964, talked by telephone with Lawson Brents concerning the need for custodial help at the Kennett offices of Production Credit Association. An appointment was made for Brents to interview "the Fielders." When the interview by Brents was subsequently held with the Fielders, the discussion, according to Brents, concerned "cleaning our office as custodian. * * * We of course had an opening for a custodian and they applied for the job and I went over the building and showed what I expected and how I wanted it taken care of and stated that the salary was $40.00 per month. * * * They were both

present. * * * They stated that they worked together."

Mr. and Mrs Fielder commenced working at the offices of Production Credit Association in Kennett on April 1, 1964, and continued to do so until the accident occurred one year later. Since the accident Mr. Fielder has alone done the janitor work at the same salary. Production Credit Association furnished the cleaning supplies used by the Fielders. Brents described the work performed by Eula Fielder as "cleaning desks or carrying out wastepaper." Mr. Fielder said his wife "dusted desks off, chairs. They have a kitchenette there. She washed the dishes up, coffee perculator, cleaned that up and worked like that. * * * Swept the floor."

Brents did "not directly" have any conversations with the Fielders as "to who was to receive the paycheck." All such checks, however, were made payable to Mr. Fielder. When asked at what time he contacted "the general office with respect to the custodian position after your interview with the Fielders," Brents replied, "I probably called them. I don't remember." He said he had "never received any approval on any kind of employment for Eula Fielder." After the Fielders had worked at the offices fifteen days, Brents received a W-4 form (Employee's Withholding Exemption Certificate) "they had sent over to have it filled out. They said they needed a Social Security number. I don't remember exactly. That is all foggy." At one point Brents recounted he told "them" (the Fielders) his record needed to show one employee. At another time Brents testified he talked alone with Mrs. Fielder who "said put Mr. Fielder down as the employee." Mr. Fielder's version was that Brents "said, 'I have got to have a Social Security number.' He said, 'Which one shall I make the check to?' And I said, 'Well, my wife asked for the job,' I said, 'Make it to her.' She were standing just around from me where she could hear me and she said, 'I ain't got my Social Security number with me.' She said, 'It doesn't

make any difference no how, this little amount. We are not going to fight over it and we spend it together. It doesn't make any difference.' So I had my Social Security number with me and he taken that. * * * "

Brents telephoned the Fielder residence "three or four" times regarding special work to be performed at the offices. He usually conversed with Mrs. Fielder and "if I needed to see them I would tell them what I needed done." The day before the accident (Friday, April 2, 1965) Brents discussed with Mrs. Fielder via telephone about his needing "the building cleaned, scrubbed, and I had a buffer." Pursuant to this call the Fielders went to the offices of Production Credit Association "prior to five o'clock" where Brents instructed them "I was wanting the wax removed from the floor and it to be scrubbed." He also directed them "how to remove the wax." The next morning (Saturday, April 3, 1965), the Fielders returned to the building at about 7:00 a.m. They had a key and were the only ones on the premises. "It had rained early that morning and the roof had leaked down at the south end of the hallway." Mr. Brents testified "the roof leaking" occurred "fairly often" and he had caused "work [to be] done on that spot [at] various times." Mr. Fielder's first chore was to "mop that up. * * * And then I got their buffing machine and buffed all those floors." In the meantime Mrs. Fielder "was just cleaning desks and the kitchenette." Offices of "the Soil Bank" were also located in the building and apparently situate off the hallway in question. These offices were traversed by the Fielders to exit the building because "that is the easiest way to get out," but Mrs. Fielder "didn't clean in the Soil Bank office." At about 8:30 a.m. respondent had "just got through cleaning the desks [and] started to go home, to go out," and was walking in the hallway "about two or three feet" from doorways leading to the lavatories when she "hit some water and slipped and fell." Mr. Fielder was "in the supply room putting this buffing machine

up * * * when she hollered * * * I turned and went back to the door that leads in out of the hall and just on the inside there she was laying on the floor * * * hollering for me to help her up * * * I drove the car right up as close as I could get to the back door and partly drug her into the car and got her in the car and got her home. * * * they called Lawson Brents and he came to the house. * * * And he picked up the telephone and called Dr. Zimmerman." The referee rejected Mr. Fielder's testimony and respondent's offer of proof that Mr. Brents, in his telephone conversation with Dr. Zimmerman, told the physician "a woman who was working for them at PCA * * * had fallen and got hurt." Mrs. Fielder was admitted to the Dunklin County Memorial Hospital at 9:15 a.m., Saturday, April 3, 1965.

Appellants' contention "the overwhelming weight of the evidence shows that Eula Fielder was not an employee of Production Credit Association" constitutes, we assume, an assertion there was not sufficient competent evidence in the record to warrant the finding that Mrs. Fielder was in the employ of Production Credit Association at the time of the accident, or such finding was clearly contrary to the overwhelming weight of the evidence. V.A.M. S., Const. art. V, § 22; § 287.490, subd. 1(3) and (4); Hinderliter v. Wilson Brothers, Mo.App., 412 S.W.2d 558, 560. Of course for the accident to be compensable the relationship of employer-employee must have existed between Production Credit Association and Mrs. Fielder when she was injured [Griffin v. Sinks Ford Sales, Mo.App., 413 S.W.2d 856, 858(1)], and the burden of proving this and all other essential elements of her claim reposed upon the respondent. Brown v. Boulevard Village, Incorporated, Mo.App., 422 S.W. 2d 389, 391(2); Meilves v. Morris, Mo., 422 S.W.2d 335, 339(5). In resolving the issues presented, we are admonished to review the evidence and legitimate inferences arising therefrom in the light most favorable to the award. Williams v. S. N. Long

Warehouse Company, Mo.App., 426 S.W.2d 725, 733(6); Sita v. Falstaff Brewing Corporation, Mo.App., 425 S.W.2d 487, 489(3); Scott v. Morrison Truck & Tractor Company, Mo.App., 422 S.W.2d 353, 355(2).

The first step in determining if Mrs. Fielder was an employee vel non of Production Credit Association is to ascertain if Lawson Brents possessed authority, actual or apparent, to engage her services and bind the principal by his conduct. Apparent or ostensible authority of an agent is derived from the conduct or manifestations of the principal and not alone from the actions of the agent. Continental-St. Louis Corp. v. Ray Scharf Vending Co., Mo.App., 400 S.W.2d 467, 470(4). The appearance of power with which the agent is cloaked by the principal "is the equivalent of expressly conferred power, insofar as third persons are concerned" (Wynn v. McMahon Ford Company, Mo.App., 414 S.W.2d 330, 336), and the exercise of such power by the agent in dealing with third persons is binding upon the principal even though it exceeds the actual power conferred. Daugherty v. Spuck Iron & Foundry Co., Mo.App., 175 S.W.2d 45, 49(2); 3 Am.Jur.2d, Agency, § 263, p. 628. As to an agent whose principal places him in "a position in which * * * it is usual for such an agent to have a particular kind of authority, anyone dealing with him is justified in inferring that he has such authority, in the absence of reason to know otherwise." Restatement, 2d, Agency, § 49, Comment c., p. 147. By dubbing Brents its Branch Manager, Production Credit Association implied he was possessed of "some general powers" [Wehrman v. Liberty Petroleum Company, Mo.App., 382 S.W.2d 56, 62(9)] which would justify others in believing his powers were general and not subject to privately imposed restrictions if they were unaware of any limitations on his authority. James H. Forbes Tea & Coffee Co. v. Baltimore Bank, 345 Mo. 1151, 1157(3), 139 S.W.2d 507, 509(3); Farm & Home Savings & Loan Ass'n of

Missouri v. Stubbs, 231 Mo.App. 87, 107 (headnote 14), 98 S.W.2d 320, 334(16); State Farm Mut. Auto. Ins. Co. v. Porter, 9 CCA, 186 F.2d 834, 842(7), 52 A.L.R.2d 499, 512 (headnote 10); 3 Am.Jur.2d, Agency, § 80, p. 484.

The Industrial Commission, as a fact-finding administrative agency, determines what credence, if any, is to be given the testimony of a witness, and is at liberty to dispose of a matter entirely upon a finding of lack of credibility of uncontradicted and unimpeached testimony. Bauer v. Independent Stave Company, Mo.App., 417 S.W.2d 693, 697(7). Had the Commission found Brents' testimony to the effect he could not hire or fire a janitor without home office approval to be incongruous with his position and other authority, we would agree. As Branch Manager, Brents admittedly had authority to "interview job applicants * * * with respect to employing persons for the Kennett office," and his testimony, reasonably interpreted in the light most favorable to the award, attests he was, in fact, endowed with authority to hire and fire employees subject to the "okay" of the general manager at Caruthersville. The record is devoid of any evidence the Fielders were ever aware of any qualifications having been imposed on Brents' authority. As his actual authority allowed, Brents interviewed the Fielders concerning the job for which "they applied." He then conducted them "over the building and showed what I expected and how I wanted it taken care of," and immediately put them to work. The Fielders "worked together," as they said they would do, for more than a year under the supervision and direction of Mr. Brents. With the proof in this pose, it would be inharmonious with reason and beyond the light of ordinary human experience by which all acts are viewed to say that Lawson Brents, as Branch Manager for Production Credit Association, was not ostensibly robed with the vestments of one duly commissioned to employ a janitor and janitress. 2 C.J.S. Agency § 105a, at pp. 1258–1259.

A person may be an "employee" under "The [Missouri] Workmen's Compensation Law," [2] either (1) because of any contract of hire or (2) because of any appointment or election. The ordinary relationship of employer and employee exists in contract [Brown v. Anthony Manufacturing Company, Mo. (banc), 311 S.W.2d 23, 27(3)] wherein, by the agreement, the employer is the one who employs another to perform service in his affairs and who controls or has the right to control the conduct of the other in the performance of the service [Talley v. Bowen Construction Company, Mo., 340 S.W.2d 701, 704(1)], and the employee is the person employed to perform services in the affairs of the employer and who, with respect to the physical conduct in the performance of the services, is subject to the employer's control. Dean v. Young, Mo., 396 S.W.2d 549, 553(1). But if there be no contract, express or implied, the relationship of employer and employee can exist for workmen's compensation purposes under "any appointment or election," i.e., the employee is the one who performs "service by 'appointment or election'" (Pruitt v. Harker, 328 Mo. 1200, 1210, 43 S.W.2d 769, 773), and the "one making the appointment and receiving the services necessarily stands in the correlative relation of employer." Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 1005, 82 S.W.2d 909, 911. "In short, it is said that only two facts are necessary to an employer-employee relationship under the Compensation Law, namely, 'one, that the claimant was in the service of the [alleged employer], and, two, that said services were controllable' by the latter." Lawson v. Lawson, Mo.App., 415 S.W.2d 313, 319(5).

Whether we pursue the contract trail or the path of appointment or election, it is patent Mrs. Fielder was in the service of Production Credit Association and subject to the control of its agent. While "the right of control [or the right to direct], rather than the fact of control governs" [Feldmann v. Dot Delivery Service, Mo.App., 425 S.W.2d 491, 496(2)], the evidence details many instances of actual control by Brents of the services performed by the Fielders. Although the services the Fielders generally performed were routine and would proceed without specific direction, the proof that Brents had the right to control is epitomized in the occasion when he directed Mr. and Mrs. Fielder in the discharge of extra or special work. In fact, it was while Mr. and Mrs. Fielder were engaged in one of these special assignments that the accident in question occurred. We do not ignore appellants' argument that all checks given in satisfaction of the $40 salary were payable only to Mr. Fielder. It mattered not to the Fielders whose name Brents used for "his record" nor to whom the checks were made payable because "we spend it together." This is not inconsistent with the general rule that where two or more persons are joint creditors, payment ordinarily may be made to any of them. Hamrick v. Lasky, Mo.App., 107 S.W.2d 201, 203(2); 70 C.J. S. Payment § 4a, pp. 214–215. Nevertheless, such an argument is of little importance because this court in Lawson v. Lawson, supra, 415 S.W.2d at 319(6), said: "But even as the master-servant relationship may exist notwithstanding the fact that the servant neither expects nor is entitled to receive any compensation * * * so payment of wages or compensation, although *usually incident* to an employer-employee relationship, is *not always an essential element* thereof." As to appellants' contentions regarding the fact Mrs. Fielder's name never appeared "of record" as an employee of Production Credit Association and she never paid any withholding or social security taxes, we again direct their attention to Lawson, 415 S.W.2d at 315,

---

2. § 287.020, subd. 1: "The word 'employee' as used in this chapter shall be construed to mean every person in the service of any employer, as defined in this chapter, under any contract of hire, express or implied, oral or written, or under any appointment or election. * * *"

where the employer " 'had no arrangement with [claimant] to pay him any wages,' paid no 'regular compensation to him,' did not enter his name on any payroll record, and did not report him as an employee for the withholding of income or social security taxes or for the computation of premiums by * * * the * * * insurer." It was held in Lawson l.c. 320, "the Commission's conclusion that claimant was not * * * an 'employee' within the contemplation and coverage of the Compensation Law is not supported by competent and substantial evidence upon the whole record and cannot stand." In Pruitt v. Harker, supra, the claimant "was held to be an employee within the meaning of the act and entitled to compensation under the act, though he drew no wages and performed his services under no contract, express or implied." Ellegood v. Brashear Freight Lines, Inc., 236 Mo.App. 971, 976, 162 S. W.2d 628, 632.

■ Injected into argument without being preserved under "points relied on" is appellants' claim Mrs. Fielder cannot recover, even assuming she was an employee, because the place where she fell was not under the "exclusive" control of the employer. To avoid making this opinion more prolix than it is, we simply note the citations refer to cases involving "statutory employees" under § 287.040 and are not in point here. The "roof leaking," which caused Mrs. Fielder to fall, had occurred "fairly often," and Brents had undertaken to have it repaired at "various times." From this it was reasonable for the Industrial Commission to infer that Production Credit Association had or, at least, assumed control over the building or that part where Mrs. Fielder fell. We do not know if Production Credit Association undertook to maintain the offices of the "Soil Bank" which were in the building. Regardless of this, Mrs. Fielder fell in the hallway before reaching those offices. Personal injuries arise out of and in the course of employment if the workmen are "engaged in, or about the premises where

their duties are being performed, or where their services require their presence as a part of such service." § 287.020, subd. 6. "[O]ur courts * * * have agreed that injuries received while leaving the employer's premises after the work is done comes within the coverage [of the Compensation Act] where it occurs on the employer's premises, or in an area over which the employer has assumed control." Lawson v. Village of Hazelwood, Mo.App., 356 S.W. 2d 539, 542–543(4), and cases cited.

Prior to the accident, Mrs. Fielder said, her "condition was good. I was working every day. I was real stout and healthy." When she was admitted to the hospital April 3, 1965, following her fall, her principal injury was diagnosed as a transcervical fracture of the right hip, id est, a transverse fracture of the femur between the head and greater tuberosity. She was put to bed, and on April 12th it was noted she had difficulty sleeping and was nervous and somewhat agitated. Mrs. Fielder was discharged from the hospital April 23, 1965. Her treating physician, Joe A. Zimmerman, M.D., prescribed complete bed rest at home for three months, and observed she was experiencing severe anxiety associated with her hip injury when she left the hospital. After remaining in bed at home for the three months as prescribed, she graduated to a wheelchair which she used about two months and then commenced using crutches. When the hearing was held in this matter on June 22, 1966, Mrs. Fielder still could not get about without the aid of crutches, although when she was home she ambulated by the assistance of one crutch and a cane. On October 10, 1965, respondent bent to level her washing machine and suffered a compression fracture of the inferior portion of her fourth lumbar vertebra. This was termed a "pathological fracture" produced by osteoporosis rather than by trauma. She was again hospitalized under Dr. Zimmerman's care and discharged October 23, 1965. Her complaints at the hearing were that "I am just no good * * * I don't eat

and I have this shuffle in my walk." She had lost 30½ pounds, and was required to stand and walk (with use of crutches) in a stooped position, or, as Dr. Zimmerman described it, "she is bent to one side."

Respondent had remained under Dr. Zimmerman's care and treatment from April 3, 1965 to the date of the hearing, and his treatment was continuing. He said Mrs. Fielder was still prescribed tranquilizers for her anxiety. In Dr. Zimmerman's opinion Mrs. Fielder was totally and permanently disabled as a result of the injuries she received April 3, 1965. He explained his disability rating somewhat in this fashion: the fractured hip (not including the muscles surrounding the hip) had resulted in a seventy to seventy-five percent disability to the right leg at the level of the hip, but because of the painful muscle constrictures suffered by Mrs. Fielder in her back and pelvis he attributed the hip injury alone as accounting for eighty percent disability to the body as a whole. Dr. Zimmerman stated a cause of osteoporosis was menopause, which Mrs. Fielder entered at age 52. However, in comparing the x-rays made in April 1965, which showed little or no osteoporosis in the lumbar spine, with the films made in October 1965, which revealed the presence of a considerable amount of osteoporosis, Dr. Zimmerman opined the osteoporatic condition was brought about by the prolonged bed rest and inactivity the broken hip had occasioned, and the osteoporosis (which caused the compression fracture of L-4) was directly related to and was a direct result of the April 3, 1965 accident. The osteoporatic condition and emotional disability suffered by respondent, coupled with the hip injury and accompanying muscle constrictures in the back and pelvis, cumulatively produced total permanent disability to Mrs. Fielder, in Dr. Zimmerman's opinion.

Thomas G. Otto, M.D., an orthopedic surgeon, had examined Mrs. Fielder for appellants on June 8, 1966. His deposition was introduced by respondent. Dr. Otto was of the opinion that "as far as employability is concerned," Mrs. Fielder's back and hip conditions combined to cause her one hundred percent disability to the body as a whole. Unlike Dr. Zimmerman, however, Dr. Otto said in his opinion Mrs. Fielder had menopausal osteoporosis which had developed gradually over the past fifteen or twenty years and predated the accident of April 3, 1965, and had no causal relationship to the accident although the bed rest and inactivity following the hip injury could have aggravated the preexisting osteoporosis. In Dr. Otto's opinion Mrs. Fielder's disability as a result of the accident was eighty percent of the right leg at the level of the hip joint. Dr. Otto did not have an opportunity to compare his x-ray films of June 1966 with those of April 1965.

■■■■ "[I]njuries which follow as legitimate consequences of the original accident are compensable, and such accident need not have been the sole or direct cause of the condition complained of, it· being sufficient if it is an efficient, exciting, superinducing, concurring, or contributing cause; thus it is immaterial whether or not a disability results directly from the injury or from a condition resulting from the injury." Manley v. American Packing Co., 363 Mo. 744, 749, 253 S.W.2d 165, 169(3). Whether the osteoporosis was a legitimate consequence of the April 3, 1965 accident was a question of fact for the Commission to decide. Oertel v. John D. Streett & Company, Mo.App., 285 S.W.2d 87, 97(2). It does not appear to us there is any serious dispute that claimant is totally and permanently disabled. Rather, we think, the question is whether the opinion of Dr. Zimmerman or that of Dr. Otto as to the producing cause of the osteoporosis is to be accepted. The choice was with the Commission unless it can be said its selection was unreasonable or that it accepted testimony which was not substantial and against the overwhelming weight of the evidence. Greer v. Missouri State High-

way Department, Mo.App., 362 S.W.2d 773, 778–779(4). We cannot say that.

The award of the Commission, in our judgment, was supported by competent and substantial evidence. It is, therefore, our duty to sustain the judgment of the circuit court in sustaining the award. It is so ordered.

HOGAN, P. J., and STONE, J., concur.