**M. K. METALS, INC., an Indiana Corporation, Appellant,**

v.

**CONTAINER RECOVERY CORPORATION, an Ohio Corporation, Appellee.**

No. 80–1242.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 8, 1980.

Decided March 17, 1981.

Rehearing and Rehearing En Banc Denied April 17, 1981.

John H. Quinn III (argued) and Richard B. Scherrer, St. Louis, Mo., for appellant; Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., of counsel.

Thomas C. Walsh (argued) and Robert M. Lucy, St. Louis, Mo., for appellee; Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., of counsel.

Before HEANEY, ROSS and McMILLI-AN, Circuit Judges.

ROSS, Circuit Judge.

In this contract action, M. K. Metals, Inc. (M. K. Metals) appeals the judgment of the district court[1] rendered following a jury verdict in favor of defendant, Container Recovery Corporation (C.R.C.). The main issue submitted to the jury was whether an

1. The Honorable John K. Regan, United States District Judge for the Eastern District of Missouri.

oral contract for the sale of scrap beverage containers existed between the parties. At trial C.R.C. sought to prove to the jury that no contract existed and the jury apparently agreed with C.R.C. However, M. K. Metals alleges that the jury was improperly instructed. Our review of the jury instructions convinces us that M. K. Metals' theory of the case was not adequately presented to the jury, therefore, we reverse and remand for a new trial.

M. K. Metals is an Indiana corporation which processes scrap materials for resale. C.R.C. is an Ohio corporation and a subsidiary of Anheuser-Busch, Inc., whose function is to collect and recycle scrap beverage containers.

In late 1978, Michael Knezevich, president of M. K. Metals, contacted C.R.C. regarding the possibility of purchasing their scrap beverage containers. Mr. Knezevich testified that an officer of C.R.C. referred him to Charles Grossman, C.R.C.'s scrap materials manager. Thereafter, all of Mr. Knezevich's dealings were with Mr. Grossman. In January 1979, C.R.C. sent M. K. Metals two 55 gallon drums of sample scrap material for M. K. Metals to test through its processing equipment. During January, February and March there were a number of phone conversations between Mr. Grossman and Mr. Knezevich regarding the sale of scrap material. Mr. Grossman made typewritten notes on these conversations which he signed. Mr. Grossman's notes of January 30, 1979, state:

M–K (Knezevich)—told Mike that CRC was willing to sell our scrap to him @ $50/G.T. shredded cans F.O.B. Marion and 17¢/# 60% recovery irony aluminum F.O.B. Marion. He would have to supply trailers to meet our production needs. In addition he would have to provide CRC with a certified letter of credit from a financial institution guaranting [sic] $30–40,000/month. If he comes through with the letter, I will meet with him at Marion.

Mr. Knezevich testified that he then contacted Gulf Metals Industries regarding a letter of credit. Gulf Metals' comptroller, Donald Switzer, testified that he contacted Mr. Grossman to discuss the letter of credit. Mr. Grossman's notes of February 16, 1979, state:

M–K Metals—Knezevich—Mr. Switzer—Gulf Metals Ind. Inc. Houston nonferrous scrap processor ($26 MM/yr. gross approximately 3–4 MM net worth) is in partnership with M–K and they will supply CRC with a $20,000 bank letter of credit for 60–90 days and an additional corporation letter of credit for $15,000 ASAP. Contingent on letters of credit and M–K being able to meet our production schedule, we will sell M–K Metals 250–400 G.T. of shredded scrap and 50,000 to 70,000 # aluminum 60% recovery scrap @ 50/G.T. and .17¢/# F.O.B. loaded their truck or rail car Marion CRC.

Between February 12th and 16th Mr. Grossman's notes indicate that C.R.C. would send M. K. Metals one carload of scrap material for a $2,000 certified check. This carload was not sent because C.R.C. did not receive the check. M. K. Metals then made arrangements to pay C.R.C. a $5,000 cash advance. Mr. Grossman's notes state:

February 22, 1979

M–K—Al Moser—Knezevich is going to transfer $5,000 into CRC's Marion account? At that time CRC will begin processing C/L of shredded cans for rail delivery @ $50/G.T. F.O.B. Marion. We will work against his $5,000 (probably 3 C/L) and continue as cash advance is replenished.

February 26, 1979

M–K Metals—Knezevich—$5,000.00 has been transferred to CRC's Marion account. We will begin shipping M–K C/L's of shredded bimetal can scrap @ $50/G.T. F.O.B. Marion as soon as we receive shipping instructions.

The parties stipulated that one carload of scrap steel was shipped on March 6, 1979, and two carloads were shipped on March 13, 1979.

Mr. Grossman's notes indicate that February 28th was the next day that the parties were in contact. Those notes state:

4. Gulf Metal Industries—Mr. Switzer—Gulf Metal will transmit to CRC (St. Louis)—the bank letter of credit for $20,000 and their personal corp. letter of credit for $15,000 will be for 90 days. M–K Metals will transmit a P.O. for one month's purchase of Marion CRC shredded bimetal cans.

9. M–K Metals—Agreed with Mike that we would accept a 6 month P.O. for our CRC Marion scrap shredded steel and irony aluminum based on # 4 above with a clause stating that CRC can cancel the contract at the end of 60 days if additional lines of credit are not made beyond the initial 90 days.

Mr. Grossman testified that he told Mr. Knezevich that C.R.C. needed a purchase order from M. K. Metals and C.R.C. would also need a written contract. Mr. Knezevich testified that Mr. Grossman dictated the terms of the purchase order to him and Mr. Knezevich believed that an agreement was reached. The purchase order sent by Mr. Knezevich was dated February 28, 1979.

On March 5, 1979, C.R.C. received the purchase order from M. K. Metals. Mr. Grossman forwarded the purchase order to his superior with the following note:

Joe—

Here is a copy of P.O. from Knezevich. With the inked changes [2] and receipt of Gulf Industries letter of credit, I think we can implement

Chuck

The parties stipulated to the events which followed:

On March 13, 1979, Charles Grossman contacted Michael Knezevich at M. K. Metals and Donald Switzer at Gulf Metals Industries, Inc. and advised them that Container Recovery Corp. would not sell the bi-metallic beverage containers produced at Container Recovery Corpora-

tion's Marion, Ohio facility on account of a higher offer made by National Steel Corporation. Charles Grossman thereupon returned M. K. Metals, Inc's written purchase order by letter dated March 13, 1979.

A bank letter of credit in the sum of $20,000.00 dated March 12, 1979 and the personal corporate guaranty of Gulf Metal Industries, Inc. dated March 12, 1979 in favor of Container Recovery Corporation were forwarded to Container Recovery Corporation by Certified United States Mail on March 14, 1979 under cover of letter dated March 13, 1979.

### Jury Instructions

The first instruction to which M. K. Metals objects is Instruction H which states:

M. K. Metals contends in this case that on February 28, 1979, Mr. Grossman of Container Recovery Corporation and Mr. Knezevich orally agreed upon all of the essential terms of a contract which were then confirmed by the purchase order dated the same day.

On the other hand, Container Recovery Corporation contends that the agreement between Mr. Knezevich and Mr. Grossman on February 28, 1979 was only on certain terms to be included in a proposed future contract and that it was fully understood by both parties on February 28, 1979 that any contract between the parties would have to be in writing and could not be finally accepted by Container Recovery Corporation until the letter of credit and guaranty promised by Gulf Metals had been received and approved.

Therefore, your verdict must be for the defendant if you believe that on February 28, 1979 the parties mutually agreed that any contract between the parties would have to be in writing and could not be accepted by Container Recovery Cor-

---

2. These changes included:

1) The price listed was to be "F.O.B. Marion."

2) Providing that prior to "May" rather than "June" the buyer had to arrange payment before shipments in that month.

3) Added "terms *net* 30 days after shipment."

4) Added the term "modification" to a clause which provided for equipment breakdown.

poration until the letter of credit and corporate guaranty promised by Gulf Metals had been received and approved by Container Recovery Corporation.

M. K. Metals argues that this instruction was a misstatement of the law because it allowed the jury to find that C.R.C. could arbitrarily reject the letter of credit. M. K. Metals offered the following proposed Instruction E to the district court:

The mere fact that Container Recovery Corporation did not receive the bank letter of credit and the corporate guaranty from Gulf Metals before Container Recovery Corporation stated that it would not sell scrap bimetallic beverage containers to M. K. Metals does not defeat M. K. Metals' right to recovery if you believe first, that the supplying of the letter of credit and guaranty were not a requirement that had to be satisfied before there could be an agreement between the parties and second, that the letter of credit and guaranty were received by Container Recovery Corporation as soon as possible.

The district court refused this instruction and indicated that the instruction was just another way of saying the same thing as was stated in Instruction H.

Our review of the evidence presented at trial and the argument of counsel before the district court and the jury has convinced us that neither instruction is a misstatement of the law. Rather, these instructions constitute the opposing "theories" of the case presented by the parties.

C.R.C.'s theory of the case was essentially that the parties did not intend to form a contract until the letter of credit was received and approved and until the contract was put in writing. Instruction H places that theory before the jury. However, M. K. Metals' theory was that the parties had agreed to all the essential terms of the contract *and* the letter of credit was merely a condition that needed to be satisfied before C.R.C. had a duty to perform. M. K. Metals' counsel in objecting to Instruction H stated to the district court: "I believe the evidence showed in this case that the letter of credit and corporate guarantee were not something upon which the existence of the agreement was contingent but rather were merely a condition precedent to perform * * *."

In *Sweetarts v. Sunline, Inc.*, 423 F.2d 260, 261 n.2 (8th Cir. 1970) this court noted that:

An enforceable contract requires that there be a definite meeting of the minds and that the essential terms of the contract be certain or capable of being rendered certain. *Thos. J. Sheehan Co. v. Crane Co.*, 418 F.2d 642 (8 Cir. 1969); *Shepard v. Glick*, 404 S.W.2d 441 (Mo. App.1966); *Macy v. Day*, 346 S.W.2d 555 (Mo.App.1961); *Brandt v. Beebe*, 332 S.W.2d 463 (Mo.App.1959); *Bearup v. Equitable Life Assur. Soc. of the United States*, 351 Mo. 326, 172 S.W.2d 942 (1943).

Both parties asserted that there had been a "meeting of the minds" but C.R.C. argued that the parties "agreed" that there would be no contract until the letter of credit was received and accepted. M. K. Metals argued that receipt of the letter of credit was not necessary to contract formation but merely a condition it was required to perform under the contract. The question of what the parties agreed to or what they intended in an oral contract is a question of fact for the jury. While C.R.C.'s factual theory as to the letter of credit was placed before the jury, the instructions did not allude to M. K. Metals' contention that the letter of credit was merely a condition precedent under the contract. *See Braun v. Lorenz*, 585 S.W.2d 102, 106–07 (Mo.App. 1979).

We acknowledge that the instructions offered by both parties were, at best, confusing. At trial there was no debate between the parties that there was an agreement that a letter of credit was to be furnished C.R.C. The factual issue for the jury was whether the parties agreed or intended that the letter of credit was a prerequisite to contract formation or was merely a condition under the contract. Once the jury found that the letter of credit was a "requirement," they were only given C.R.C.'s

theory that factually the letter of credit was a "requirement" for contract formation. Nowhere was the jury told that the "requirement" could also be construed as one necessary to be performed *under* the contract.

■ The Missouri courts have noted that "[a] contract condition which qualifies a duty of performance by a party does not make the existence or validity of the contract hinge on the condition." *Cohen v. Crumpacker*, 586 S.W.2d 370, 375 (Mo.App. 1979).

> Conditions precedent * * * are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available.

3A A. Corbin, Corbin on Contracts § 628 (1960). Similarly, the tentative draft of the Restatement (Second) of Contracts states that:

> § 250 Condition Defined
>
> A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.
>
> § 252 How an Event May be Made a Condition
>
> An event may be made a condition either by the agreement of the parties or by a term supplied by the court.
>
> § 269 When Breach by Non-performance Excuses the Non-occurrence of a Condition
>
> Where a party's breach by non-performance substantially contributes to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.
>
> *Comment:*
>
> *a. Excuse of non-occurrence of condition.* Where a duty of one party is subject to the occurrence of a condition, the additional duty of good faith and fair dealing imposed on him under § 231 may require some cooperation on his part, either by refraining from conduct that will prevent or hinder the occurrence of that condition or by taking affirmative steps to cause its occurrence. Under § 260(2), non-performance of that duty when performed is due is a breach. See Illustration 3 to § 260. Under this Section it has the further effect of excusing the non-occurrence of the condition itself, so that performance of the duty that was originally subject to its occurrence can become due in spite of its non-occurrence.
>
> § 278 Effect of a Repudiation as Excusing the Non-occurrence of a Condition
>
> Where a party's repudiation contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.
>
> *Comment:*
>
> *a. Rationale.* This Section accords the same effect to a repudiation that § 269 accords to a breach by non-performance. No one should be required to do a useless act, and if, because of a party's repudiation, it appears that the occurrence of a condition of a duty would not be followed by performance of the duty, the non-occurrence of the condition is generally excused. In judging whether occurrence of the condition would be followed by performance of the duty the obligee may take the obligor at his word. Nevertheless, the repudiation must contribute materially to the non-occurrence of the condition, and if the condition would not have occurred in any event, its non-occurrence is not excused. In such a case both parties are discharged.

Restatement (Second) of Contracts §§ 250, 252, 269, 278 (Tent. Draft No. 1–7 1973, No. 8 1973, No. 9 1974).

■ Section 2–325 of the Uniform Commercial Code (U.C.C.) (Mo.Ann.Stat. § 400.-2–325 (Vernon)) states:

> "Letter of credit" term—"confirmed credit"
>
> (1) Failure of the buyer seasonably to furnish an agreed letter of credit is a breach of the contract for sale.

We do not believe that this section of the U.C.C. negates the factual possibility that a letter of credit is required for contract formation. *See Hirsch y Cia v. Rosenblatt*

*Casing Co.*, 418 F.2d 1300 (2d Cir. 1969). But this section would indicate that factually a letter of credit could be construed as a condition precedent. *See Diskmakers, Inc. v. DeWitt Equipment Corp.*, 555 F.2d 1177, 1179 (3d Cir. 1977).

 We therefore hold that the failure to give Instruction E was prejudicial error and requires a new trial.

The second instruction which M. K. Metals argues the district court erred in refusing is as follows:

Parties may enter into agreements without a signed writing. Thus the mere fact that the agreement for the sale of bi-metallic beverage cans contended by plaintiff to exist in this case was oral, does not defeat plaintiff's right to recovery.

While the first sentence of this instruction is a correct statement of the law under *Ashbaugh v. Sims*, 483 S.W.2d 80, 83 (Mo. App.1972), the instruction is misleading. One of C.R.C.'s factual theories as set forth in Instruction H was that the parties had agreed that there must be a written contract. Whether the parties intended that there be no contract until a formal document was executed was a factual question for the jury. *See* 1 A. Corbin, Corbin on Contracts § 30 (1963). If M. K. Metals had proposed an instruction containing language such as "unless the parties intend only to be bound by a written contract," we might be inclined to find error. But this instruction, as worded, attempted to remove an issue of fact from the jury.

The third instruction to which M. K. Metals objects involved actual and apparent authority. The trial court gave one instruction on its own motion concerning the definition of "apparent authority." The other instruction given was requested by C.R.C. and it stated:

Container Recovery Corporation contends in this case that Charles Grossman did not have authority to enter into oral agreements for the sale of bimetallic beverage containers on Container Recovery's behalf, except on a carload by carload basis. If you believe that Mr. Grossman did not have such authority and if you also find that on February 28, 1979 Mr. Knezevich was aware that any contract for the purchase of the month by month output of Container Recovery had to be submitted to the officers of Container Recovery and approved by the officers of Container Recovery in writing, then I instruct you to find for the defendant, Container Recovery Corporation.

While the issue of the scope of Mr. Grossman's *actual* authority was a hotly contested issue at trial, our reading of the transcript reveals no evidence from which a jury could conclude that Mr. Grossman lacked *apparent* authority. Mr. Knezevich testified that he had been initially referred to Mr. Grossman by a C.R.C. officer. Mr. Grossman's title was scrap materials manager. More importantly, Mr. Grossman testified that:

I did not tell Mr. Knezevich that I did not have the authority to approve this [6 month agreement], but I did tell Mike that it was necessary to have a written agreement and that the written agreement would have to be approved.

Mr. Grossman was then asked if he told Mr. Knezevich who would have to approve the agreement and Mr. Grossman answered "No, I did not."

In *Wynn v. McMahon Ford Co.*, 414 S.W.2d 330, 337 (Mo.App.1967) the court quoted the following portion of § 27 of the Restatement (Second of Agency):

" * * * apparent authority can be created by appointing a person to a position, such as that of manager or treasurer, which carries with it generally recognized duties; to those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position, regardless of unknown limitations which are imposed upon the particular agent * * *. Thus, a manager has apparent authority to do those things which managers in that business at that time and place customarily do, as to persons who know that he is a manager, although they do not know what powers managers in such a business have."

See also *Galemore Motor Co. v. State Farm Mutual Automobile Insurance Co.*, 513 S.W.2d 161, 166 (Mo.App.1974); *Fielder v. Production Credit Ass'n*, 429 S.W.2d 307, 313 (Mo.App.1968).

■ While we find no factual dispute as to the issue of apparent authority, we hold that the giving of these instructions was not reversible error. First, one of the instructions requested by M. K. Metals and given by the trial court contained the terms "actual or apparent authority." Secondly, appellant failed to object to the instructions at trial and we are not inclined to label the instructions as "plain error." On retrial of this cause of action, the district court is free to give such "authority" instructions as are considered necessary and which are in keeping with § 27 of the Restatement (Second) of Agency.

The last instruction to which M. K. Metals objects involved damages. The trial court instructed the jury that " * * * the measure of damages for defendant's failure to sell bi-metal beverage containers to plaintiff is the lost profits you believe the plaintiff suffered as a consequence of the breach by defendant." The damages instruction offered by M. K. Metals but refused by the district court stated:

If you find the issues in favor of the plaintiff and are thereafter determining what sum if any to award the plaintiff, you are instructed that the measure of damages for defendant's failure to sell bi-metal beverage containers to plaintiff is the difference between the market price at the time plaintiff learned of the breach and the contract price together with any incidental and consequential damages, including any lost profits claimed by plaintiff, less any expenses saved in consequence of the breach by defendant.

■ With the exception of the "lost profits" clause, the refused instruction basically

follows § 2–713 of the U.C.C. which is entitled "Buyer's damages for nondelivery or repudiation." (Mo.Ann.Stat. § 400.2–713 (Vernon).) Recently, this court noted that Missouri law allows the recovery of lost profits caused by the breach if the evidence is sufficient for estimating their amount with reasonable certainty. *Vigano v. Wylain, Inc.*, 633 F.2d 522, 528 (8th Cir. 1980).

■ M. K. Metals argues that the district court erred in refusing to instruct the jury that the measure of damages was the difference between market and contract price *plus* lost profits. While this argument at first appears to have merit based on §§ 2–713 and 2–715[3] of the U.C.C., the record does not support appellant's contentions.

M. K. Metals' evidence concerning damages was introduced through the testimony of Ray Plummer. Mr. Plummer's calculations of lost profits were based on the difference between the cost per ton of scrap metal at the alleged *contract* price and the resale price per ton M. K. Metals was receiving for a ton of processed metal (minus such items as freight costs and processing costs). Because Mr. Plummer's calculations were based on contract price rather than market price (which was considerably higher), his estimate of lost profits, in fact, already included the difference between contract price and market price.

Under § 2–715(2)(a) of the U.C.C. proof of such consequential damages as lost profits may require additional proof by the buyer of foreseeability and opportunity to cover. *See* comments 2, 3 and 6 to Section 2–715. While it may be preferable to treat the difference between contract and market price as a separate item of damages, appellant's evidence lumped that amount into its calculations of "lost profits." The district court was understandably worried that to allow damages on both of appellant's theo-

---

**3.** Mo.Ann.Stat. § 400.2–715 (Vernon).

ries would amount to double recovery.[4] Based on appellant's evidence of "lost profits," we find no error in the district court limiting damages to that amount.

## Statute of Frauds

C.R.C. alleges that the district court erred in denying its motion for a directed verdict based on noncompliance with the statute of frauds. M. K. Metals argues that the purchase order sent to C.R.C. satisfied the "merchants exception" to the statute of frauds, section 2–201(2) of the U.C.C. (Mo. Ann.Stat. § 400.2–201(2) (Vernon)) which states:

> (2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

■ First, C.R.C. alleges the purchase order received on March 5 was not "a writing in confirmation of the contract." The terms stated in the purchase order,[5] however, refute this argument. Most of the terms are geared toward the satisfaction of the seller-C.R.C. rather than the buyer. The terms are so specific as to the "desires" of C.R.C. that the "purchase order" reflects prior dealings. As U.C.C. comment 1 to Section 2–201 states "[a]ll that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction."

■ Second, C.R.C. contends that its letter of March 13, 1979, to Mr. Knezevich was

---

4. The following example is provided in J. White, R. Summers, Uniform Commercial Code § 10–4, 394–95, n.91 (2d ed. 1980):

> In granting a buyer lost profits because he is unable to resell a product, a court must be careful not to overcompensate him. Assume for example, that a buyer sues wholesaler for nondelivery of a shipment of fiberglass skiis under section 2–713. He might ask for the market-contract differential (assume it is $10,000–$8,000) plus consequential damages which are lost resale profits. If he could resell the shipment of skiis at $15,000 but he cannot cover, his lost profits will be $7,000 ($15,000–$8,000). Should a court allow a recovery of $9,000 (the market-contract differential plus lost profits)? First, 2–715(2)(a) requires cover if it is at all reasonable, and that principal would eliminate lost profits in most cases. Secondly, in the unusual case where cover is impossible the court should award only $7,000 since that amount will put the wholesaler in the same position he would have been in if the manufacturer had sent the skiis. If the court gives the buyer the market-contract differential of $2,000 under 2–713, then the "loss resulting" from the wholesaler's inability to resell under 2–715(2)(a) is only $5,000.

5.

| Quantity | Description | Price per cwt |
|---|---|---|
| (1) | | |
| ALL | Steel scrap from bimetallic beverage containers for the months of March, April, May,[2] June, July and August, 1979. To be shipped in RR cars (gondolas) or open-top trailers in the manner acceptable to CRC. | $50.00 gross ton |
| ALL | Irony aluminum scrap from bimetallic containers, for the same duration. To be loaded on open tops trailers, provided by purchaser, serviced to meet sellers production output. | $ 0.17 per pound |
| (2) | Payment terms arranged for a three months period. Buyer to provide payment arrangements prior to any shipments in the month of June. Failure to do so will cancell [sic] Sellers obligation automatically without any notice to the purchaser. | |
| (1) | It excludes shipment of three gondolas committed for shipment by the seller elsewhere. | |
| | Purchaser willing to purchase flattened bimetallic beverage containers for $50.00 gross ton, f.o.b. Marion, Ohio loaded on our trailer in lieu or in addition to shredded steel scrap, provided sufficient notice given by the seller of his intent to do so due to equipment breakdown or other justifiable causes. | |

a "written notice of objection to [the purchase order's] contents" which was given within 10 days. The March 13, 1979 letter states in pertinent part:

> At this time we regret that we cannot enter into an agreement with you for a six month period as defined in your enclosed purchase order no. 1053 because of an offer of $140/G.T. for our flattened cans.

We do not believe that this statement voices "an objection to [the purchase order's] contents." The language does not challenge the price stated in the purchase order as incorrect or something the parties never discussed. Rather, it simply indicates that there was someone who was willing to pay more than the amount stated in the purchase order. *See Perdue Farms, Inc. v. Motts, Inc.,* 459 F.Supp. 7, 21–22 (N.D.Miss. 1978).

This case is reversed and remanded to the district court for a new trial.[6]

---

**6.** Since a new trial is ordered, M. K. Metals' contention regarding improper comments during closing argument need not be reached.